**ORIGINAL**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF T___

**FILED**

OCT 3 0 2000

CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALLEN ZISHKA and GERALD R. DAILEY, et al., On Behalf of Themselves and All Others Similarly Situated, | ) Civ. No. 3-98CV0660-M ) ) <u>CLASS ACTION</u> ) |
| Plaintiffs, | ) <u>AMENDED COMPLAINT FOR</u> ) <u>VIOLATION OF THE SECURITIES</u> |
| vs. | ) <u>EXCHANGE ACT OF 1934</u> ) |
| AMERICAN PAD & PAPER COMPANY, CHARLES G. HANSON, III, RUSSELL M. GARD, GREGORY M. BENSON, KEVIN McALEER, ROBERT C. GAY, JONATHAN S. LAVINE, MARC B. WOLPOW, and BAIN CAPITAL, | ) ) ) ) ) ) ) |
| Defendants. | ) <u>DEMAND FOR JURY TRIAL</u> ) ) |

137

## SUMMARY OF ACTION

1.      This is a suit on behalf of purchasers of American Pad & Paper Company ("Ampad" or the "Company") stock between 6/25/96 and 12/17/97 (the "Class Period"), alleging violations of §10(b) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 against Ampad's former four senior executives, as well as a §20(a) control-person liability claim against these executives and three of the Company's directors, plus Bain, who, by virtue of its control of the majority of outstanding stock, and the fact that throughout the Class Period, it controlled at least 50% of Ampad's Board, and, through a management contract, provided consulting and other financial and support services to the Company, were positioned to dictate the Company's conduct. This action complains of a scheme by which Ampad attempted to escape from a failing 1992 leveraged buyout ("LBO") by misrepresenting its business, financial results, and prospects in order to garner $234 million by way of an initial public offering ("IPO"). At the same time the IPO enabled Bain to reap $49 million by selling just a small portion of its stock in Ampad. Before the Class Period began, in the IPO Prospectus and throughout the Class Period, defendants made material misrepresentations and omissions. Despite ongoing operational difficulties, particularly in the newly-acquired Williamhouse Division, the Company executives asserted that the restructured Company was a growth company in a growth industry, had competitive advantages, had successfully integrated three acquisitions, was uniquely well-positioned to benefit from consolidation at the retail-distribution level, and had policies that insulated the Company's profits from any adverse raw-material price fluctuations. In the IPO Prospectus and throughout the Class Period, defendants also provided investors with false financial statements that overstated earnings through improper revenue recognition and improper methods of valuing its inventory. During the Class Period the Company's stock traded in an efficient market on the New York Stock Exchange under the symbol "AGP."

2.      Ampad, a Dallas-based Company, bankrupt since January 10, 2000, marketed nationally branded and private-label writing pads, file folders, index cards, and envelopes through its manufacturing divisions to office-products distributors. In 1992, CEO Hanson and COO Gard – who ran Ampad as a subsidiary of Mead Corporation – and Bain purchased the Company in an LBO with short-term financing from Mead. Bain, Hanson and Gard invested only $3 million of their

own capital – $2.85 million by Bain and $280,000 by Hanson and Gard – and borrowed almost all the rest from Mead, leaving Ampad saddled with a huge acquisition debt. When it lost over $22 million during 1994-95, the Company could barely service, let alone repay, the LBO debt.

3.     By mid-95, defendants knew that the LBO was in danger of failing. Ampad had accumulated a *negative* shareholders' equity of $66 million and the book value of Hanson's, Gard's and Bain's shares was a *negative* ($17.06) per share. Bain, Hanson and Gard knew that if the collapse of the Company's floundering LBO was to be avoided, they needed to raise cash to pay down or refinance the oppressive debt. Thus, an IPO was the only way to salvage the LBO, pay off investment bankers, bail them out of a dangerous financial situation, and also create a trading market in the Company's stock.

4.     Completing an IPO for a company that sells pads, cards, form paper, and envelopes presented a tremendous challenge because the office-paper-products industry was viewed, at best, as one of very slow growth and, at worst, a dead investment – plagued by commodity products, rising raw-material prices, intense competition, slow revenue, and an inability to pass rising costs on to customers. In fact, even before the IPO, demand for the products produced by Ampad was softening or declining. Indeed, Ampad lost $7 million in 1994 and $15 million in 1995 due, in part, to decreasing prices it could charge its distributors and small retail customers and decreasing demand. Despite this trend toward obsolescence, defendants needed to make Ampad appear to be a "growth" company in a "growth industry."

5.     In 10/95, in preparation for the IPO and as part of the plan to make Ampad appear profitable, the Company's LBO debt was restructured, Mead was paid off using investment-banker loans, and envelope-manufacturer Williamhouse was acquired. On 6/25/96, Ampad filed its Registration Statement, which included its IPO Prospectus and was signed by Hanson, Gard, Benson and three Bain representatives – Wolpow, Lavine and Gay. The Prospectus emphasized the Company's "growth strategy," stressed its "competitive strengths," claimed that it provided "continued opportunities for growth and profitability," and stated that it planned to follow the Williamhouse acquisition with several more acquisitions that would boost the Company's growth.

Hanson, McAleer, and Benson continued to make false and misleading statements about Ampad's growth prospects and also issued false financial statements throughout the Class Period.

6.     On 11/10/97, knowing that the Company's false financial results would soon be exposed, Hanson and Gard each sold 50,000 shares of Ampad stock – 20% of the stock they actually owned – at $13 per share, pocketing $1.3 million in illegal insider-trading proceeds. Just five weeks later, on 12/17/97, Ampad revealed it would incur a $13.4-million charge and suffer a huge 4thQ-97 loss of $.46-$.50 per share – a loss so large that it would suffer a loss for the full year 1997 as well. Following this revelation, Ampad's stock collapsed to $7-3/4 per share, and continued to decline until the Company ultimately declared bankruptcy and all shareholder value was wiped out. Thus, the only shareholders who profited from investing in Ampad were Hanson, Gard and Bain.

7.     The graphs below show Ampad's stock price during the Class Period, and illustrate its collapse as the previously-concealed facts about the Company's business emerged. The performance of Ampad's stock is also compared to an index of similar companies, which shows that the Company's stock-price action was due largely to Company-specific events and not market forces:

**American Pad & Paper Co.**

**January 2, 1997 - January 2, 1998**



**American Pad & Paper Company**
## vs. Proxy Peer Group
## July 2, 1996  - January 29, 1998



## JURISDICTION AND VENUE

8.     Jurisdiction exists via §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  Venue is proper in this District because the Company is based here and many of the relevant acts occurred here. Defendants used the instrumentalities of interstate commerce and the facilities of the national securities markets.

## PARTIES

9.     The Court appointed Lead Plaintiffs Gerald R. Dailey, Roger Norton, Priscilla Knight, David W. Leffler, and Fred E. Ryals, who purchased a total of 7,325 shares of Ampad's stock in July and September 1997 and were damaged thereby.

10.     (a)     Defendant Charles G. Hanson, III was Chairman of the Board of Directors, CEO, and a member of Ampad's Executive-Committee.  He owned 250,000 shares of its stock and sold 50,000 shares for $650,000 in 11/97.

(b)     Defendant Russell M. Gard was Chief Operating Officer, member of the Board of Directors, and an Executive-Committee member.  He owned 250,000 shares of its stock and sold 50,000 shares for $650,000 in 11/97.

(c)     Defendant Gregory M. Benson was Executive VP and Director of Strategic Planning and Acquisitions through 1996.  He was CFO of Ampad through 8/96, when he resigned to join Bain as a managing partner.  He was also a member of Ampad's Board of Directors throughout the Class Period, even after he joined Bain.

(d)     Defendant Kevin McAleer was VP-Finance until 8/96, and Ampad's CFO thereafter, until he resigned in 11/97.

11.     (a)     Defendant Robert C. Gay, who is being sued only under §20(a), was a member of the Board of Directors, an Executive-Committee member since 1992, and a Bain managing director since 1989.

(b)     Defendant Jonathan S. Lavine, who is being sued only under §20(a), was a member of the Board of Directors since 1995, and he has been with Bain since 1993, and a managing

director since 1997. He was one of two members of the Company's Audit Committee in 1995 and 1996.

(c)     Defendant Marc B. Wolpow, who is being sued only under §20(a), was a member of the Board of Directors since 1995, an Executive and Audit-Committee member in 1995 and 1996, and has been a Bain managing director since 1995.

12.     Defendant Bain, including Bain Venture Capital, which is being sued only under §20(a), is a controlling shareholder of Ampad. Before the IPO, Bain acquired 13.4 million shares of Ampad – 90% of its stock – for $2.85 million. It also had three to four representatives, who were its employees, agents and controlled persons, on Ampad's Board of Directors throughout the Class Period, including two members of Ampad's four-member Executive Committee and both members of its two-member Audit Committee during 1995-96. Three of the six signatories to the 6/96 Registration Statement, in connection with the IPO, were Bain's representatives. Even after selling 3.4 million shares of its pre-IPO stock for $49 million, Bain continued to own 38.5% of the outstanding Ampad stock and had up to four representatives on its Board, as well as members of its Executive and Audit Committees. Thus, throughout the Class Period Bain controlled at least 50% of Ampad's Board, and, through a management contract, provided consulting and other financial and support services to the Company.

13.     Hanson, Gard, Benson (to 9/96), and McAleer were Ampad's highest ranking officers, and each had direct involvement in its everyday business, were privy to confidential information, and were involved in drafting, reviewing, or disseminating the alleged misleading statements. As high-level corporate officers, each of them was responsible for the statements in prospectuses, press releases, and other documents issued by the Company to the public.

14.     Because of their executive positions held with the Company, Board membership, stock ownership, and contemporaneous Bain positions, Hanson, Gard, Benson, McAleer, Gay, Lavine, Wolpow and Bain were each controlling persons of Ampad and exercised the power and influence to cause the Company to engage in the unlawful conduct alleged.

**DEFENDANTS' SCIENTER**

**Defendants' Receipt of Internal Reports and Attendance at Company Meetings**

15.     Hanson, Gard, Benson (to 9/96), and McAleer acquired knowledge of the adverse, material facts alleged because of their top-level positions with the Company. They were hands-on managers who interfaced with each other and other executives, including department and division managers, controlling shareholder Bain, Board members, as well as Ampad and Williamhouse employees during facility visits. Moreover, Hanson, Gard, Benson (as CFO through 8/96), and McAleer (until his 11/97 resignation) had offices near each other. Employees observed that it was their custom and practice to communicate on a regular basis with each other about Company business and industry trends, especially pricing and costs issues, and they traveled together to Ampad facilities for employee presentations. During the Class Period, Hanson, Gard, Benson, and McAleer regularly attended sales and planning, Board, and department meetings. Topics discussed included how Ampad's products were selling, raw-material price fluctuations and market conditions, product costs, the Company's ability to raise product prices for its customers, profit margins, paper and raw-material inventory levels, and the integration status of Williamhouse, Niagra and Shade/Allied.

16.     According to a former corporate purchasing group agent, the Company held regular corporate meetings, such as "Shortage Meetings," "Seasonal Promotional Meetings," and "Divisional Meetings," which were attended by Hanson and Gard, and sales, marketing, and financial personnel. In addition, Hanson, Benson, and McAleer participated in conference calls with market professionals and analysts and were quoted in Company press releases during the Class Period. They each spoke credibly about all aspects of Ampad's business and finances, as a result of being apprised of all material developments on a regular basis to ensure that they knew about its operations.

17.     The Company also maintained a regular reporting system to ensure that its executives knew about Company-specific business conditions and developments, including sales and pricing-related matters. To that end, the Ampad and Williamhouse divisions regularly generated Performance Reports on how their products were selling; Exceptions Reports on raw-material shortages; Materials Requirements Planning Reports, which were generated once a week by a

computerized accounting-inventory system to calculate raw-material amounts to be ordered based on the number of forecasted orders; and Pricing Sheets, for Company products bought and sold. Importantly, Hanson, Gard, Benson, and McAleer had access to industry publications, including *Pulp and Paper Weekly*, which reported on commodity prices for raw-materials and pricing-related issues and trends. These publications also confirmed what defendants already knew from internal, but undisclosed data: raw-material costs for paper products, though fluctuating, had been on the rise since 1994 and the Company could not easily pass along its costs to its customers. Moreover, the prices for its finished products were declining as Ampad lowered them to compete with the larger manufacturers for the superstores' business.

18.     As a result of these many information sources, Hanson, Gard, Benson, and McAleer were regularly informed about Ampad's product sales, customer demand, inventory, and financial results, especially pricing issues that were critical to the Company's survival. Defendants were well aware that both before and during the Class Period the demand for most of the products that Ampad manufactured was either declining, not growing much, or expected to decline in the future. This was particularly true for forms-paper – the primary product produced by Shade/Allied which was acquired by Ampad in 2/97. They also knew from direct employee contact and reports during visits throughout the Williamhouse/Niagra and Ampad/Shade/Allied divisions that the cost of goods and raw-material prices were driving the industry and were *fundamental* issues crucial to the Company's financial stability and prospects.

**Defendants' Due-Diligence Participation**

19.     Just before and during the Class Period, Ampad consummated three major acquisitions: Williamhouse in 10/95, Niagara in 6/96, and Shade/Allied in 2/97, for approximately $400 million. The Company conducted due-diligence investigations of each, including on-site visits by Hanson, Gard, and their operations deputies. As a result of the efforts undertaken to make these significant acquisitions, Hanson, Gard, McAleer, and Benson learned about problems Ampad would, and ultimately did, inherit, including management-information and other integration deficiencies, which were compounded by high raw-material costs and an inability to pass the costs on to its customers.

**Hanson's and Gard's Insider Selling**

20.     Hanson and Gard personally profited from their false and misleading statements about the Company's business.  In 11/97, immediately following Hanson's forecast that Ampad was achieving the promised success and that it would make a profit in 4thQ-97 and in 1997 overall, Hanson and Gard each sold off 20% – 50,000 shares each – of their own Ampad stock for total proceeds of $1.3 million in 11/97, even though they had never before sold any Ampad stock.  Just five weeks later, the Company announced a huge 4thQ-97 loss and its stock collapsed.  Nonetheless, these unusual stock sales generated significant net gains for Hanson and Gard because, unlike Class members who purchased Ampad stock at artificially inflated prices as high as $24 per share, they obtained their stock by way of the LBO for a mere $.22 per share. Since Hanson's and Gard's initial LBO investment was under $300,000, they profited by over $1 million from their involvement in Ampad – even after the stock collapsed.  Moreover, before the IPO in 7/96, the book value of Hanson's and Gard's stock holdings was a negative ($2,298,891).  Thus, the $1.3 million garnered by their 11/97 stock sales was pure profit to Hanson and Gard.

## FALSE ACCOUNTING

21.     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, except that they need not include disclosures that would be duplicative of accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

22.     In an effort to camouflage its declining business condition, Hanson, Gard, McAleer, and Benson (to 9/96) caused Ampad to issue financial statements that were false and misleading and violated GAAP.  As a result of improperly recognizing revenue, recording LIFO-reserve reductions in the face of long-term increases, and improperly recording costs of sales at the Williamhouse Division, the Company was able to overstate its earnings and portray itself as more successful than

it actually was.  In doing so, Ampad presented materially false financial results during the Class Period in violation of GAAP.

23.     By way of their fraudulent accounting practices, the Company reported the following financial results during the Class Period:

|  | Q2 96 | Q3 96 | Q4 96 |
|---|---|---|---|
| Revenues | $114.1 M | $173.6 M | $176.0 M |
| Net Income (Loss) | $ 0.7 M* | $ 6.9 M* | $ 10.5 M |
| EPS | $ 0.02 * | $ 0.24 * | $ 0.36 |
|  | Q197 | Q297 | Q397 |
| Revenues | $149.8 M | $167.2 M | $176.5 M |
| Net Income | $ 4.0 M | $ 4.7 M | $ 1.6 M |
| EPS | $ 0.14 | $ 0.16 | $ 0.06 |

* Earnings before extraordinary charges for losses on extinguishment of debt.

24.     Ampad included its FY96 results in a Form 10-K, and its quarterly results for FY96 and 97 in Forms 10-Q, which were filed with the SEC.  The annual Form 10-K included a report, entitled "Responsibility for the Consolidated Financial Reports," which was signed by Hanson and McAleer and represented that:

> Company management is responsible for the preparation, accuracy and integrity of the consolidated financial statements and other financial information included in this Annual Report. This responsibility includes preparing the statements in accordance with generally accepted accounting principles and necessarily includes estimates that are based on management's best judgments.

Likewise, quarterly Form 10-Qs represented that the financial statements included all adjustments necessary "for a fair presentation" of the Company's financial results and position.  These statements were also false and misleading because the financial results were neither prepared in accordance with GAAP nor did the financial information "present fairly" the Company's operations.

25.     Ultimately in 12/97, Ampad reported horrible 4thQ-97 results and incurred $13.4 million in pretax charges caused by its accounting improprieties during the Class Period:

> Fourth quarter results will be negatively impacted by the recording of accounting charges aggregating approximately $11.6 million (after-tax), including a $5.9 million (after-tax) charge to increase the Company's LIFO reserve to reflect the anticipated impact of the three paper price increases that were implemented

- 10 -

during 1997. Other charges relate to adjustments to the Company's cost of goods sold and assumed effective tax rate. In addition, the Company has experienced lower than expected gross margin levels in the fourth quarter, due primarily to a delay in the implementation of price increases by the Company, changes in product mix and an increase in the percentage of promotional sales.

## Ampad's Violation of GAAP in Recognizing Revenue

26.     As described in FASB Statement of Concepts No. 5, ¶¶83-84 ("Concepts"), revenue is not recognized until earned, meaning that a company needs to have accomplished all that it must do to be entitled to record the revenue. In a business like Ampad's this is usually accomplished when products are shipped to customers. Consistent with these requirements, Ampad represented in its 6/25/96 Registration Statement, filed with the SEC, and its 1996 and 1997 Form 10-Ks, that its revenue-recognition practice complied with GAAP and Concept No. 5: "The Company recognizes revenue upon shipment of the product. All risks and rewards of ownership pass to the customer upon shipment. Damaged or defective products may be returned to the Company for replacement or credit."

27.     Contrary to GAAP and stated Company policy, at least as early as 1995 Hanson, Gard, McAleer, and Benson caused Ampad to fraudulently report revenues before shipping products to customers. At the end of each quarter, before and during the Class Period, there was a push to get as many orders shipped and booked as possible. Beyond the routine quarter's-end push, it was well known throughout the Company that customers, including Wal-Mart and Dixon, were pre-billed for goods that had not yet been shipped and, in some cases, had not even been manufactured. Ampad recognized these before-shipment billings as current-quarter revenue even though the Company had not earned the revenue according to GAAP and its own revenue-recognition policy. Likewise, contrary to GAAP and the Company's stated policy, revenue was booked on sales to certain customers, who were granted liberal return privileges beyond the right to return damaged and defective goods. Simply stated, to boost its sales, which many times were already booked, Ampad promised customers that they could return products that they were unable to sell. Consequently, the Company ultimately suffered large amounts of product returns, which contributed to its inventory problems and led, in part, to the $13.4-million charge announced in 12/97.

**Ampad's Violation of GAAP in its Inventory Valuation**

28.     GAAP, as set forth in Accounting Research Bulletin No. 43, Chapter 4, Statement 2, states: "A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues." GAAP also requires that the information presented be reliable. Concepts No. 2, ¶¶58-59, "defines reliability as that quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent."

29.     During the Class Period, Ampad was caught in a profit-margin bind. On one hand, there were fluctuating, but much higher raw-material costs. On the other, the Company was unable to recoup those costs because competitive pressures were causing decreasing prices charged to its customers for finished product. Thus, to minimize the effects of this bind on its financial results, the Company manipulated its ending-inventory valuation, which had a direct relation to its reported cost of goods sold, gross profit, and earnings. For *each dollar* that inventory was overvalued, the result was a one-dollar overvaluation of reported gross profit, a one-dollar understatement of cost of goods sold, and a one-dollar overstatement of reported pretax earnings.

30.     Ampad utilized the last-in, first-out ("LIFO") method to value its inventory, whereby it assumed that the most recently purchased inventory item – the last in – is the first to be sold – the first out. Accordingly, it was required to expense to cost of goods sold the value of its most recently purchased raw-material inventory, based on the most recent purchase cost. And it should have valued its ending inventory, under LIFO, by the oldest purchase cost for an item in its inventory. *See* AICPA Issues Paper, "Identification and Discussion of Certain Financial Accounting and Reporting Issues Concerning LIFO Inventories," ("LIFO Issues Paper"), 11/30/94.[1]  For example,

---

[1]          SEC Accounting Series Release No. 293 states:

LIFO is an inventory pricing method based on a flow-of-cost assumption that the last item purchased is the first item sold. In times of rising prices, LIFO generally results in higher current costs being charged against income, while older, lower costs are retained in inventory. Of the two fundamental reasons for using LIFO, one is oriented toward financial accounting and the other is income tax oriented. From the standpoint of financial accounting, proponents of LIFO argue that, by charging to expense those costs which more closely reflect the replacement cost of inventory, LIFO tends to reduce the illusionary profits obtained from merely

where a company has 10 units in inventory and the current cost is $6 per unit, the replacement costs of the inventory would be $60. Where four of the units were purchased for $5, and the remaining units were purchased at $6, the LIFO inventory cost would be $56 (4 x 5 = $20 + 6 x $6 = 36). The difference between inventory under LIFO and inventory under replacement costs must be accounted for in a LIFO reserve. In this example, the LIFO reserve would be $4 ($60-$56). Under this method of inventory valuation, when Ampad's purchase cost for raw materials increased along with its inventory levels, the replacement cost of inventory also increased. Thus, to properly value its inventory under LIFO, the Company's LIFO reserve should have increased as well. But Ampad's LIFO reserve *decreased* – meaning it went from a negative reserve to zero and then to a positive reserve before it was again reversed in 12/97. This decrease is demonstrated below:



31.     In fact, there was no justification for the Class-Period decreases in the LIFO reserve. Before and during the Class Period, raw-material costs for paper products, though fluctuating, were much higher. Increased raw-material costs were particularly severe in 1997. According to Ampad's

---

holding inventories and thereby reflects more accurately the "true" income of a company.

1981 SEC LEXIS 1151, at *2 (7/2/81).

1997 10-K, "[f]rom May 1997 through October 1997, all but one of the key commodity grades of paper utilized by the Company increased in cost between 6% and 18%." In addition, according to the 1996 Form 10-K, gross inventory levels had increased – as of 12/31/95 and 96, they were $103.5 million and $104.8 million, respectively. Thus, Ampad's reduction of its reserve during the Class Period, to a point where it became an addition to inventory instead of a reduction, was unjustified. In fact, by eliminating the LIFO reserve on 12/31/96, and creating a negative reserve for the next four quarters (shown by positive numbers in the chart above), Hanson, Gard, McAleer, and Benson (to 9/96) added $8.05 million in gross-profit and pretax earnings to Ampad's fourth quarter and fiscal year ended 12/31/96. This before-tax-earnings increase caused the reported gross margin to be 23.2% for the quarter versus a disastrous 18.7% – an increase of 24%. This accounting impropriety was ultimately corrected in 12/97 when the Company was forced to incur more than $6 million to adjust its LIFO Reserve for 1997 raw-material price increases.

**Ampad's Manipulation of Cost of Sales**

32.    In violation of GAAP, the Company also failed to adequately record its costs of sales, thereby materially and artificially inflating its earnings. Soon after acquiring Williamhouse in 10/95, CEO Hanson, COO Gard and CFO Benson learned that its reporting system for cost of goods sold produced unreliable and faulty results. Thus, they knew a new reporting method was necessary. But their efforts to implement one were unsuccessful during 1996-97, and Williamhouse continued to under-report its costs of sales. The Company, which failed to properly adjust for this problem, consolidated Williamhouse's under-reported costs of sales into its own, thereby overstating Ampad's gross profit and net earnings. As a result, the pro forma results reported in Ampad's IPO Prospectus were false.

**Ampad's Other GAAP Violations**

33.    Additionally, due to the detailed accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

(a)    the principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)     the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)     the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)     the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     the principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

(g)     the principle that conservatism be used as a prudent reaction to uncertainty so that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97); and

(h)     the principle that inventory should be reported at the lower of cost or market (ARB No. 43, Chapter 4).

34.     Further, the undisclosed, material, adverse information concealed by Hanson, Gard, Benson, and McAleer during the Class Period is the type of information which, because of SEC regulations, national stock-exchange regulations, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to and must be disclosed.

35.     Ultimately, in 4thQ-97, the Company was forced to incur additional operating costs of $13.4 million, including more than $6 million to adjust its LIFO reserve for 1997 price increases, and another significant portion was attributed to its inability to successfully implement a new method of reporting Williamhouse costs of sales.  Moreover, since the Class Period, Ampad has admitted that it was saddled with increased costs and had no real way to raise prices for the majority of its customers.  As noted in its 1999 Form 10-K: "Since the Company's last acquisition in 1997, revenues have declined, margins have eroded, competitive pressures in the marketplace kept the Company from fully recouping increasing paper prices, and inventory levels were, for a period of time, built to an excessive level."

## AMPAD'S INITIAL PUBLIC OFFERING

36.     To generate investor interest in the Ampad IPO and sell the 15-million shares of stock, Hanson, Gard and Benson knew that a publicity campaign to distribute favorable information about the Company's business and prospects was necessary.  Thus, during the IPO roadshow presentations, Hanson, Benson and Gard stated that:

•       due to the restructuring of its business, the 10/95 Williamhouse acquisition, and changes in the distribution of office-paper products, Ampad was now a *growth company in a growth industry*.

•       the office-products distribution channel was undergoing a major consolidation into larger superstore outlets. Ampad was organized and uniquely positioned to capitalize on this trend, enabling it to gain market share and achieve strong revenue and EPS growth over the next several years.

•       the Company was uniquely well-positioned to increase its sales to office superstores, one of the most important and rapidly growing segments of the office-products industry.

•       Ampad had de-emphasized the commodity nature and portion of its business by introducing new, value-added products, which carried higher, more profitable prices and would contribute to strong revenue and EPS growth over the next several years.

- the Company would make several accretive acquisitions over the next few years that would contribute to strong, profitable growth.

- Ampad had implemented sophisticated cost-control and accounting systems, which enabled it to effectively control its inventory levels and expenses so that it would achieve profit gains that *exceeded* its revenue growth.

- the Williamhouse acquisition was a tremendous success, was already being integrated into the Company's operations, and was performing better than expected, resulting in substantial synergies and cost savings.

- Ampad had competitive strengths and purchasing advantages, enabling it to secure lower prices for raw materials, which benefitted its profitability.

- the Company had successfully implemented a pricing strategy to shield its gross-dollar margins from the pricing volatility of raw-materials traditionally present in the paper business. This would enable it to maintain its profit margins in the face of raw-material-price fluctuations.

- Ampad had achieved strong operating momentum, which would lead to substantial revenue growth in the next several years.

- the Company expected 30% EPS growth in 1997 and 1998 and at least 20% ongoing EPS growth thereafter.

These representations increased the demand for and the price of Ampad's stock in the 7/96 IPO.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

37. On 6/25/96, the Company filed the IPO Registration Statement with the SEC. The Registration Statement was signed by Hanson, Gard, Benson, Wolpow, Gay, and Levine and included the IPO Prospectus. While, as demonstrated below, the Registration Statement and Prospectus showed that the Company had lost $7.5 million in 1994 and $14.6 million in 1995 from its historical operations, it also presented Ampad as now being profitable on a pro forma basis, *i.e.*, giving effect to the financial results of certain companies Ampad had recently acquired, the most important of which was Williamhouse, which defendants knew continued to under-report its costs of sales:

- 17 -

| | Year ended 12/31 | | Pro Forma | Three Months Ended 3/31 | Pro Forma |
|---|---|---|---|---|---|
| | Historical | | | Historical | |
| | 1994 | 1995 | 1995 | 1996 | 1996 |
| | (in thousands, except per share amount) | | | (unaudited) | |
| **Income Data Statement:** | | | | | |
| Net sales | $120,443 | $259,341 | $617,167 | $121,418 | $149,735 |
| Income (loss) from operations | ($3,566) | $1,350 | $57,493 | $12,503 | $14,162 |
| Net income (loss) | ($7,548) | ($14,686) | $16, 723 | $128 | $3,883 |
| (Loss) per share | | ($.91) | $.56 | $.01 | $.13 |

Thus, the Prospectus indicated that the Company's business was profitable on an ongoing basis and had made a profit in 1stQ-96. These representations, along with the claim that Ampad's results were fairly presented and in conformity with GAAP, *were false for the reasons explained at* ¶¶21-35.

38.     The IPO Prospectus also falsely identified "indebtedness," "acquisition strategy," "fluctuating paper costs," "dependence upon significant customers," as well as other *potential* risk factors that could affect a decision to invest in Ampad.  But many of these risks were currently plaguing the Company and were not the mere abstract risks presented.  For example:

(a)     the Prospectus warned that "based upon current levels of operations, it *should* be able to meet its debt service obligations when due."  But, as set forth in ¶¶21-35, because Ampad's financial statements were false, the Company was neither *not then profitable*, nor would it be on an ongoing basis. Additionally, the IPO was driven by the Company's $22-million loss during 1994-95 and its inability to repay its outstanding LBO debt;

(b)     the Prospectus claimed that acquisitions, particularly Niagra, are "likely to enhance the Company's operations and profitability," but warned that "there can be no assurance that the Company *will continue* to acquire businesses or assets on satisfactory terms or that any business or assets ... will be integrated successfully."  The Company made only one other acquisition during the Class Period – Shade/Allied in 2/97.  And those already made – Williamhouse in 10/95 and Niagra in 6/96 – were *not* and would not enhance the Company's operations and profitability;

Indeed, defendants, especially Strategic-Acquisition VP Benson, knew Ampad had already purchased substantial management-information and production problems in its recent acquisitions, demonstrating that the new businesses and assets were not being integrated successfully;

      (c)    the Prospectus claimed that "the Company adopted new pricing policies," which would guard against the affects of fluctuating raw-material prices, and then warned that "no assurance can be given that the Company *will continue* to be successful in maintaining such pricing policies." But when the Prospectus was issued, the "new" pricing policies were already 18 months old and had not and would not protect the Company from the adverse effects of prior fluctuations. In fact, Ampad was still exposed to the same dangers from price fluctuations that negatively affected its earnings in 1994-95. As set forth in ¶¶21-35, the only truly new policy adopted by the Company was the manipulation and falsification of its financial statements in 1995 to avoid having to reflect the adverse affects of price fluctuations in 1995; and

      (d)    the Prospectus warned that a "significant decrease or interruption in business [from its major customers] *could have* a material adverse effect on the Company." But when the Prospectus was issued, Ampad executives were aware that there was already significant industry consolidation – with the trend certain to continue – as small vendors/customers were gobbled up by superstores and mega-retailers in the office-products retail sector, which had already had a material affect on the Company's growth.

    39.    The Prospectus, while containing a list of misleading there-can-be-no-assurance risk factors, was extremely positive about the Company's business, future growth, and competitive advantages regardless of raw-material fluctuations, the Prospectus stated that:

> The Company has targeted and will continue to target those customers driving consolidation in the retail, commercial and paper merchant distribution channels and *believes that it is uniquely positioned to meet the special requirements of these customers.... Furthermore, as these customers continue to grow and as they consolidate their supplier bases, the Company's ability to meet their special requirements becomes an increasingly important competitive advantage....*

    40.    The Prospectus also falsely claimed that Ampad had the following competitive strengths that "*distinguishes*" the Company as a leading manufacturer and marketer of paper-based office products (excluding computer forms and copy paper) in North America:

- Market Leader. *The Company has achieved market leadership in core products sold to customers in the largest and fastest growing office products channels by offering one of the broadest assortments of high quality products in the industry....*

- Well-Positioned and Diversified Customer Base. *The Company has substantial opportunities for growth within several distribution channels of the office products industry.* The Company has focused on the largest and fastest growing office products channels.... *The Company's Williamhouse division maintains particularly strong relationships with the largest and fastest growing paper merchants/ distributors in the market .... The Company also maintains strong customer relationships across all of the other office products distribution channels, including mass merchandisers, warehouse clubs, office products wholesalers and independent dealers.*

- National Scale and Service Capability. *The Company's extensive product line, multiple brands and broad price point coverage provide significant advantages and economies of sale in selling to and servicing its customers....*

- Innovation/New Products. The Company has introduced several innovative products as part of its marketing strategy to differentiate itself from other suppliers and enhance profitability....

- Low-Cost Manufacturer. *The Company believes it is among the lowest-cost manufacturers of paper-based office products in the industry. The Company ensures its low-cost manufacturing position through its paper purchasing and distribution advantages as well as its maintenance of modern and efficient manufacturing technology and a high quality workforce....*

- Purchasing Advantages. The Company has strong relationships with most of the country's largest paper mills ... *These relationships afford the Company certain paper purchasing advantages, including ... favorable pricing arrangements.*

- Proven Management Team With Successful Track Record. The Company's senior operating management team averages over 25 years each in the paper products industry. Management has succeeded in increasing sales and operating profitability *by recognizing and acting on the transition to the fastest growing distribution channels, introducing higher value-added products ....*

41. The Prospectus also claimed that:

- "*New, higher value-added products* give the Company a greater selection to offer its customers and *improve product line profitability for both the Company* and its customers. *The Company plans to differentiate itself from other suppliers and improve profitability through product innovation, differentiation and line extensions.*"

- "*The Company believes that there are significant opportunities to acquire companies in both its existing and complementary product lines. In addition, the Company intends to enter new office products markets through acquisitions of established companies in those markets.*"

- 20 -

- "The Company's market presence and distribution strengths *uniquely position it to sell new or acquired product lines* across its distribution channels, including national office products superstores, national contract stationers, office product wholesalers and mass merchandisers. *As an important part of its growth strategy, for example, the Company has successfully introduced the envelope product lines acquired in the [Williamhouse] Acquisition*, previously distributed primarily through paper merchants/distributors, to the Ampad division's distribution channels under the Ampad and private label names.   The Company estimates that this market opportunity is approximately $350 million in annual net sales."

- "The Company has identified and is in the process of implementing cost reductions in connection with the Acquisition that are expected to result in approximately $7.4 million of annualized cost savings. *In addition, management plans to implement further identified cost reductions beyond 1996.*"

42.     Ampad's reliance on the pro forma financials to sway investors is highlighted by the portion of the IPO Prospectus that presented Ampad as a restructured company whose previous losses *were not representative of its future results* and represented that it had now successfully protected its profitability against fluctuations in raw-material paper prices:

> *The Company believes that its future operating results will not be directly comparable to its historical operating results because of its strategic acquisitions and the expected cost savings from integration of the [Williamhouse] Acquisition.*
>
> \* \* \*
>
> *Paper Prices.  Paper represents a majority of the Company's cost of goods sold.*  While paper prices have increased by an average of less than 1% annually since 1989, certain commodity grades have shown considerable price volatility during that period.   This volatility negatively impacted the Company's earnings in 1994, particularly in the fourth quarter, *as a result of the Company's inability to implement price changes in many of its product lines without giving its customers advance notification.  Beginning in January 1995, the Company adopted new pricing policies enabling it to set product prices consistent with the Company's cost of paper at the time of shipment.  The Company believes that it is now able to price its products so as to minimize the impact of price volatility on dollar margins.  In addition, as a result of acquisitions and new product introductions, the Company offers a broader and more diverse product mix which is less susceptible to paper price fluctuations....*

43.     The positive representations and statements in the Prospectus, and those made during the IPO roadshow by Hanson, Gard, and Benson, were each known to be or were recklessly disregarded by them as being false and misleading when made.  The true facts, which they knew, but intentionally or recklessly concealed – disclosure of which was necessary to make the statements not misleading – were that:

(a)     the Company had not successfully implemented a new pricing strategy that would protect its gross-dollar profit margins from raw-material paper-price fluctuations. Thus, its business remained as exposed as ever to adverse price fluctuations, which Ampad concealed by manipulating and falsifying its financial statements, including its cost of goods sold, LIFO, revenue recognition and inventory reserves as detailed in ¶¶28-31;

(b)     during 1996, the Company's core operations and profitability were adversely affected by high raw-material costs which it was unable to pass along to customers, especially envelope-product purchasers. The adverse effects were being disguised by falsifying its cost-of-sales calculations, especially in its Williamhouse Division, as detailed in ¶¶22-23, 32;

(c)     raw-material cost hikes from its major suppliers were having a material, adverse effect on its actual results of operations, which was being concealed by the manipulation of its LIFO reserve, as detailed in ¶¶28-31;

(d)     the Company was not significantly improving its business or profitability by the successful introduction of distinctive value-added products. In fact, there were very few new products and its office paper-products business remained simply commodities;

(e)     demand for most of the products that Ampad manufactured was either declining, not growing much, or expected to decline in the future. Forms-paper was the most well-known product whose market was declining, and this declining trend was clearly evident well before Ampad purchased Shade/Allied, whose primary product was machine-paper;

(f)     Ampad had no significant competitive strengths different from other office paper-products suppliers. Thus, it was exposed to all negative forces in a highly competitive commodity-product business, including severe price competition and the adverse effects of retail-price declines on its limited-growth profits, and cost increases for its raw-materials;

(g)     the Company only appeared to be meeting its profitability goals by manipulating and falsifying its financial statements as detailed in ¶¶21-35;

(h)     Ampad had not successfully integrated the Williamhouse and Niagara acquisitions. Rather, it was encountering significant difficulties dovetailing their operations,

especially with respect to management-information systems, product quality, rising raw-material costs, declining prices charged to customers, and loss of major customers;

(i)      the Prospectus claimed that Ampad "has introduced several innovative products as part of its marketing strategy to differentiate itself from other suppliers and enhance profitability," and listed as a "[r]ecent example ... World Fibre ground-wood writing pads." This product was neither innovative, effective nor profitable. Because of a free-sheet paper shortage in 1994-95, as explained by a former regional national account executive, Ampad utilized an alternative ground-wood sheet known as "World Fibre." But the Company knew that this product had numerous problems – when a pen touched this "innovative" product, the ink spread and stained the paper. As a result, the market never accepted it;

(j)      the ongoing consolidation of the office-products retail channel into superstores was a negative trend because, as smaller retail vendors were displaced, the Company's ability to achieve increased sales was negatively affected due to the superstores' sophisticated inventory-management practices and volume purchasing leverage that put manufacturers and vendors consistently at a disadvantage. Moreover, Ampad was neither uniquely nor well positioned to benefit from retail office-product consolidation because it offered neither distinctive products nor significant competitive or purchasing advantages; and

(k)      Williamhouse's and Niagra's envelope product sales were below levels internally forecasted or budgeted due to intensive competition and integration deficiencies. Consequently, the Company was forced to sell those products at reduced prices to move inventory, which had an adverse effect on its actual results of operations, which was concealed by the deliberate manipulation of cost of sales as detailed in ¶32.

44.      On 7/2/96, as a result of strong investor interest generated by Hanson, Gard and Benson in roadshow presentations and in the 6/25/96 IPO Registration Statement, which included the IPO Prospectus – signed by Hanson, Gard, Wolpow, Benson, Levine and Gay – Ampad went public selling 12.5 million shares at $15 per share. Bain sold 3.5 million shares for $49 million. Ampad's IPO proceeds – $172.8 million – were used primarily to pay off the huge LBO debt.

- 23 -

45.     On 7/29/96, the Company reported its 2ndQ-96 results: sales of $114 million, net income of $691,000, EPS of $.02 (before extraordinary item), pro forma sales of $140 million, net income of $5.1 million, and EPS of $.17.  Ampad's release referenced "*the successful acquisition of Williamhouse*'" and CEO Hanson stated: "We achieved our profitability goals and are on target with new product introductions and market penetration to our fast growing key customers: national contract stationers, office supply super stores, mass merchants and paper merchants.  Our costs savings programs continue to yield results."  The Company included these financial results in its 2ndQ-96 Form 10-Q later filed with the SEC and signed by McAleer.

46.     On 7/29-30/96, Hanson and Benson had conversations with large shareholders, portfolio managers, brokers, stock traders, and analysts, including Christopher Vroom of Alex. Brown, Martin Romm of First Boston, P.M. Iossa of Bankers Trust/BT Securities, and R.F. Runkle of Morgan Stanley Securities, to discuss second-quarter results, representing that:

•       the Company's financial results were on plan, due to strong demand for its products and its tight cost controls – business momentum was strong.

•       growth of the superstore retail office-products distribution channel was a very positive development for Ampad, which was uniquely well-positioned with competitive advantages to benefit from this important industry trend.

•       the Company had identified several potential accretive acquisitions that it would complete during the next few years, which would help boost its EPS-growth rate going forward.

•       Williamhouse, which had been a tremendous success, and Niagara were being successfully integrated into Ampad's business and important synergies and cost savings were being realized.

•       Williamhouse's sales were growing strongly, boosting its profitability as its operating costs were being reduced.

•       the Company was continuing to successfully introduce distinctive new innovative value-added products that were helping to boost its profits.

•       Ampad had successfully implemented its new pricing strategy, which would shield its earnings from the volatility of paper prices.  In fact, it had achieved its outstanding 2ndQ-96 results in the face of raw-material price increases because of this new and successful pricing strategy.

•       the Company's special relationships with paper mills continued to provide it with important purchasing advantages.

•       Ampad was forecasting 1997 EPS of $1.30-$1.40, and a 20%-30% EPS-growth rate after that.

47.    One month after the IPO, on 8/7/96, Alex. Brown issued a report on the Company, written by Christopher Vroom, with a "*strong buy*" recommendation, which was based on and repeated information provided by Hanson and Benson in the 7/29-30/96 conversations. This report forecast 1997 EPS of $1.33 and a three-to-five year EPS-growth rate of 20%, stressing *the Company's "long-term growth prospects"* and "*above-trendline near-term earnings momentum.*" The report also stated:

> *STRATEGIC ACQUISITIONS EXPAND THE OFFER.... The most significant of the acquisitions was the October 1995 addition of Williamhouse, marking the Company's entry into the envelope business*. The June 1996 acquisition of Niagara, also an envelope manufacturer, *set the stage for operating improvements and increased scale and distribution capabilities in that product line*. The Company ... expects envelopes to make an important contribution to increased penetration at retail in 1996. *We expect AP&P to continue to be active on the acquisition front, having identified at least 30 potential candidates....*

> *   *   *

> ... Moreover, management has been successful in implementing a pricing strategy to shield earnings from the volatility characteristic of the paper business. Thus, in the just-ended 2Q 1996, despite volatile paper prices, gross profit dollars were well-managed and came in on plan.

48.    Likewise, on 8/16/96, First Boston issued a report, written by Martin Romm, which was based on and repeated information provided by Hanson and Benson in the 7/29-30/96 conversations. The report called Ampad a "*growth story within a growth industry*" and forecast 1997 EPS of $1.40, a three-year EPS growth rate of 30%, and stated:

> *Accordingly, we believe that AGP is a growth story within a growth industry*. The company is *uniquely positioned* to be the *primary source* of paper based products to the office product market. With the company's production and distribution scale, AGP *is positioned to be the preferred supplier of its core products*.

49.    On 8/28/96, Morgan Stanley also issued a report, written by R.F. Runkle, which was based on and repeated information provided her by Hanson and Benson, in the 7/29-30/96 discussions. The report forecast 1997 EPS of $1.36, 4thQ-96 EPS of $.40, and a five-year EPS growth rate of 20+% , and stated:

> [A]s a result of the Williamhouse (1995) and Niagara (1996) acquisitions, *the company now has the No. 1 position in envelopes sold through the paper merchant channel, as well as an emerging retail envelope business*.

> *   *   *

- 25 -

The ability to provide **new, innovative products is another competitive advantage** in this rapidly consolidating industry, we believe....

\* \* \*

... **AGP also enjoys purchasing and distribution cost advantages due to its scale of the acquired company, improving AGP's operating efficiencies**....

\* \* \*

... **Beginning in 1995, however, the company implemented a pricing policy that enabled it to set prices of its product consistent with the prevailing market price of paper at time of shipment. To date, this policy has been accepted by its customers and has allowed the company to manage its margin dollar in a fluctuating pricing environment**.

50.     The positive representations and statements made between 7/29 and 8/28/96 by Hanson and Benson and reaffirmed by McAleer when he signed the 2ndQ-96 Form 10-Q, were each known to be or were recklessly disregarded by them as being false and misleading when made. The true facts, which they knew, but intentionally or were recklessly concealed – disclosure of which was necessary to make the statements not misleading – in addition to those set out at ¶43, were that:

(a)      As Ampad embarked on its acquisition strategy – Williamhouse, Niagra and, Shade/Allied – its payroll went from 300 to over 7000 employees in fewer than two years. A corporate entity – Ampad – was formed to administer the various entities and for consolidated financial reporting purposes. Williamhouse (including Niagra), Creative Card, and Ampad (which eventually included Shade/Allied) all existed as semi-independent divisions under the Ampad corporate umbrella. After the 10/95 Williamhouse acquisition, which was far from "a tremendous success" and "being successfully integrated,"the internal controls were erratic. Williamhouse personnel were overwhelmed with the amount of inventory to be accounted for. For instance, excessive raw materials were often found during physical inventories. Rather than conduct an audit or construct a paper trail to explain the unaccounted-for excess, supervisors were frequently instructed to enter the newly discovered inventory into the accounting system as "an adjustment." The excess inventory was entered at full-cost, which meant some Williamhouse inventory was being received twice. This accounting method for received, but previously unaccounted-for inventory persisted with Ampad's oversight of Williamhouse and Niagra plant operations. By Summer 1997, the raw-material inventory problem became so significant that temporary clerks were hired to

- 26 -

account for the products, but because they were very inexperienced, they committed scores of mistakes;

(b)     Concurrent with the Class-Period excessive-raw-material problem was the opposite problem of not being able to get sufficient quantities of certain other raw-materials for production. This problem arose because once Dallas-headquarters personnel assumed control over purchasing raw-materials for the Williamhouse Division (including Niagra), they would not attempt to fill certain raw-material orders if they were considered too small to be cost effective. As a result, customer-service representatives complained about unfilled orders as production declined. For example, some orders from Nationwide, a major customer, could not be filled as a result of insufficient raw-material;

(c)     In the months after the 10/95 acquisition, Ampad sent accounting staff to Williamhouse headquarters to integrate the financial systems. In Spring 1996, corporate accounts-payable managers were involved in integrating Williamhouse's accounts payable into the Company's payables division. They found that Williamhouse had a high-volume backlog of unpaid vendor payables and what they described as other "various bizarre things" that delayed integration for several months. Financial-system integration was further delayed because Ampad hired temporary clerks who were inadequately trained for the scope and complexity of the task;

(d)     After the Company acquired Niagara in 6/96 and began attempting to mesh Niagra's and Williamhouse's envelope businesses, it became apparent that Niagara's "old" computer system had been efficient and effective, but the purported integrated system was "antiquated." A key deficiency was that information retrieval required multiple steps to get what had been previously been easily obtainable with a single step at Niagara – "pick-ship" tickets were particularly difficult to obtain. In fact, the Williamhouse computer system – later compounded by what customer-service managers describe as the ineptitude of Dave Coons, who came from the Company to be Plant Manager at Niagra/Williamhouse in Denver – caused massive shipping problems with customers often receiving two or three times the amount of goods that they ordered. In other cases, the system would show that an order had been shipped and billed it had never been made. Former customer-service representatives and managers report that "nobody knew what we had in inventory";

- 27 -

(e)     Many Niagra customers complained about poor service and quality. Customer service and receiving personnel worked 14 hours a day trying to solve the problems arising from the flawed information system. Even then, customers often hung up on customer-service personnel because it took the computer system so long to bring up necessary information. Product quality also declined due to poor employee morale prompted by the information-system inefficiencies. When shipments were actually made, the Niagra/Williamhouse/Ampad integration problems did not end. Besides being poorly made, products were often mislabeled when shipped, which resulted in lost sales, including sales to key customers Unisource and Nationwide. And far from Ampad enjoying competitive advantages, Niagra's competitor, National Envelope, gained business due to the Company's inability to manufacture and ship orders in a timely and accurate manner;

(f)     According to former inventory-control and shipping supervisors, Williamhouse had very loose, if not nonexistent internal controls for maintaining its inventory raw-material and finished-products goods inventory. Moreover, product returns from key Williamhouse customers – including Staples, Dixon and Nationwide – increased significantly during the Class Period. As a result, Williamhouse personnel sent finished goods to be stored at a third-party distribution center without entering these inventories into the computerized accounting system. Instead, they maintained only paper records to track what was sent to the distribution center. Only when an order for these goods was placed were the finished goods entered into the accounting system; and

(g)     As a result of these negative factors, Hanson and Benson knew that their 1996-97 EPS and 15%-25% EPS-growth forecasts over the next three-to-five years were false and misleading when made.

51.     On 9/4/96, Staples and Office Depot, two of Ampad's largest customers, announced their merger, creating some uncertainty about the Company's business because it was a supplier to both. Some investment-community members also feared this could hurt Ampad's growth. To reassure the market that this was not an adverse, but rather a positive, development, Hanson and McAleer had discussions with analysts on 9/4-5/96, during which they represented that:

- the merger was a very positive development for the Company – it would strengthen its competitive position as Ampad was uniquely positioned to sell to and service these superstores.

- the Company was reaffirming its EPS forecasts for 1996-97.

52.     On 9/5/96, Morgan Stanley issued a report on the Company, written by Runkle, which again forecast 1996 EPS of $1.03 and 1997 EPS of $1.36, 4thQ-96 EPS of $.40, and a 20% five-year EPS growth rate, based on discussions with Hanson and McAleer, and the report stated: "Given AGP's *strong competitive position, superior execution, and potential for continued growth, we believe the shares of AGP will outperform the market over the next 12 months*."

53.     On 9/27/96, after more discussions with Hanson, Morgan Stanley issued another report written by Runkle, which reiterated the same forecasts noting that: "We recently spoke with management ... *our confidence in the feasibility of AGP's strategy and in management's ability to execute continues to grow.*"

54.     On 9/27/96, Alex. Brown issued a report on Ampad, written by Vroom, entitled "BUY THIS STOCK TODAY," based on discussions with Hanson and McAleer.  The report forecast 1996 EPS of $1.02, 1997 EPS of $1.33, and 1998 EPS of $1.70, including 4thQ-96 EPS of $.43, and stated:

> Our enthusiasm for the Company rests on our conviction that AP&P's management has established a firm basis for *driving exceptional internal growth while benefitting from the consolidation of the vendor channel through judicious acquisitions*.  We like the stock too, [with] ... our 1997 EPS estimate despite 20% long-term growth and greater projected near-term gains.  We think that increased *investor awareness of the Company's solid story and favorable fundamental developments regarding acquisitions will help drive these shares higher and thus we recommend prompt new commitments to the stock....*

> \*   \*   \*

> [W]e nevertheless expect accelerating sales momentum through the 2H.

> AP&P IS POSITIONED TO BE A BENEFICIARY OF THE MASSIVE CONSOLIDATION AT RETAIL.  We see an important opportunity for AP&P to pick up additional market share through the merger of the two superstore leaders.... *Thus, while many see the SPLS/ODP merger as negative for AP&P, we point out that this Company was formed precisely to benefit from increased concentration.*

> ACQUISITIONS WOULD PROMPT REVISION TO OUR EARNINGS PROJECTIONS.  AP&P management has done an *excellent job acquiring and integrating other office products manufacturers and we sense heightened urgency with respect to the acquisition process.  We expect these potential purchases to be accretive to earnings and none are reflected in our 1997 forecast.*

- 29 -

55.     On 10/22/96, Alex. Brown issued another report written by Vroom, which repeated the forecasts contained in its 9/27/96 report, and again stated "BUY THIS STOCK TODAY." This report stated:

> Our enthusiasm for the Company rests on our conviction that American Pad & Paper's management *has established a firm basis for driving internal growth* .... We think that increased investor awareness of the Company's solid story and favorable fundamental developments regarding acquisitions will help drive these shares higher ....
>
>                         \* \* \*
>
> •     *The acquisition pipeline is full*, increasing the potential for upside earnings surprise in 1997.
>
>                         \* \* \*
>
> *Current Business Momentum Is Strong*.  Management has made excellent progress in driving revenues .... The Company's progress in this regard illustrates the *competitive advantages* accruing to those singular manufacturers that recognize the changing reality at retail....
>
> The financial consequences of sharp merchandising and marketing skills have been impressive across the board as the Company has gained market share within existing lines *while successfully leveraging new products across diverse channels of distribution*....

56.     On 10/24/96, Ampad reported 3rdQ-96 results of with sales of $173.6 million, net income of $6.9 million, EPS of $.24 (before an extraordinary item), pro forma net income of $8.9 million, and EPS of $.30, and quoted CEO Hanson: "'*We ... continue to meet our profitability goals while increasing market penetration to our fast growing key customers*.'"  Ampad's financial results were later included in the Company's 3rdQ-96 Form 10-Q, which was filed with the SEC and signed by McAleer.

57.     On 10/24/96, Ampad held a conference call for large shareholders, money and portfolio managers, analysts, brokers, and stock traders.  During that call, Hanson and McAleer made presentations, answered questions and had follow-up conversations during which they stated:

•     the Company's financial results were on plan and business momentum was strong.

•     Ampad was uniquely well-positioned with competitive advantages to benefit from the growth of the superstore retail office-products distribution channel.

•     the Company had identified several potential accretive acquisitions that it would complete during the next few years.

- •   Williamhouse, with sales were growing strongly, and Niagara being successfully integrated.

- •   the Company was continuing to successfully introduce distinctive new value-added products.

- •   Ampad was forecasting 1997 EPS of $1.30-$1.40, and a 20%-30% EPS-growth rate after that.

58.   On 10/25/96, Bankers Trust/BT Securities issued a report, written by Kanev, which was based on and repeated information provided him in the 10/24/96 conference call and follow-up conversations with Hanson and McAleer.  The report forecast 1996 EPS of $1.02, 1997 EPS of $1.30, a $15+% secular growth rate, and stated: "*Management* ... has positive expectations for 1997, with growth being driven by ... *a stronger presence in the retail envelope sector resulting from the recent integration of the Niagara acquisition* ... [and] management continues to pursue additional acquisition opportunities."

59.   On 10/25/96, Alex. Brown issued a report, written by Vroom, which was based on and repeated information provided him in the 10/24/96 conference call and follow-up conversations with Hanson and McAleer.  The report forecast 1996 EPS of $1.03, 1997 EPS of $1.33, 4thQ-96 EPS of $.42, and stated:

> *Important progress with key accounts through innovation and skilled merchandising continues to drive top-line gains, while leverage and acquisition-related cost reductions contribute to what we believe will be 20% compound annual EPS growth over the next 3-5 years.*
>
> * * *
>
> AP&P IS WELL-POSITIONED TO GROW WITH THE FAST-GROWING RETAIL CHANNELS.  The Company has made excellent progress penetrating its large accounts in the fast-growing channels; office product superstores, contract stationers and mass merchants ....  As the retailers grow, scale, mix and geographic reach all become increasingly more important; *these are just the attributes that we believe give AP&P its competitive advantage.*

60.   On 11/4 and 11/8/96, First Boston issued reports, written by Romm, which were based on and repeated information provided him in the 10/24/96 conference call and follow-up conversations with Hanson and McAleer.  The report forecast 1996 EPS of $1.00, 1997 EPS of $1.40, 4thQ-96 EPS of $.37, and stated:

... [T]here has been an increase in uncoated free sheet paper costs that is being implemented by the mills. *Under AGP's pricing strategy, the price increases on paper costs are passed through its customers at the time of shipment*....

... *We believe the company remains well positioned to capitalize on this continuing trend toward consolidation*.

\* \* \*

*It should also be noted that AGP continues to successfully integrate recent acquisitions. The Niagara Envelope acquisition has been integrated with WilliamHouse, producing strong economies that had been projected with the combination of these two companies*. AGP continues to be *uniquely positioned to make additional acquisitions .... We remain confident that in the long term acquisitions will play a role in driving AGP's growth*.

61.     On 12/16/96, Morgan Stanley issued a report, written by Runkle, entitled "NOTES FROM MEETING WITH MANAGEMENT," based on discussions with Hanson and McAleer, which forecast 1997 EPS of $1.36, 1998 EPS of $1.72, 4thQ-96 EPS of $.40, a 20% five-year EPS-growth rate, and stated:

•       We had the opportunity to talk with Charles Hanson, CEO, and Kevin McAleer, CFO, last week ....

•       In a nutshell, *the acquisition pipeline remains full* and AGP continues to aggressively pursue accretive acquisitions ....

\* \* \*

•       *Continuing to Make Inroads at Large Retailers*.   Management also discussed some of the inroads the company's products have made over the course of the past several months.

62.     On 1/7/97, Ampad announced it would acquire Shade/Allied, a small manufacturer primarily of computer-form paper.  On 1/7-8/97, Hanson and McAleer spoke to analysts at Morgan Stanley, Alex. Brown, Bankers Trust/BT Securities, and First Boston to present this acquisition as a very favorable development, which would boost Ampad's revenue and EPS growth *immediately*, and thus they were increasing the Company's 1997 EPS forecasts to $1.42-$1.50, 1998 to $1.70-$1.81, and reaffirming its 15%-20% EPS-growth-rate forecast.

63.     On 1/8/97, Morgan Stanley issued a report that again forecast 4thQ-96 EPS of $.40, raised 1997 EPS forecast from $1.36 to $1.42, and the 1998 EPS forecast from $1.72 to $1.81, while maintaining the 20+% five-year EPS forecast.  The information in the report was obtained from Hanson and McAleer and stated: "In our opinion, Shade/Allied provides yet another *significant*

- 32 -

*growth opportunity for AGP*, fits perfectly within the AGP business strategy, [and] *should be accretive from day 1 ....*"

64.     On 1/8/97, Alex. Brown issued a report, written by Vroom, which was based on information from Hanson and McAleer and stated:

> VERY POSITIVE ON NEW ACQUISITION OF SHADE/ALLIED.
>
> * * *
>
> *CORE BUSINESS STRONG.* In addition to *successfully executing an intelligent acquisition* strategy, AP&P management has refined merchandising and marketing initiatives in a manner that has helped drive solid business momentum.

65.     On 1/8/97, Bankers Trust/BT Securities issued another report, written by Kanev, which raised the 1997 EPS forecast to $1.45, and 1998 to $1.70, while continuing to forecast a 15% secular-growth rate, based on information from Hanson and McAleer, and stated:

> *Management expects the [Shade/Allied] acquisition to be immediately accretive to earnings.* Our 1997 and 1998 projections have been revised to reflect contribution from Shade-Allied's base business as well as additional revenues to be gained from cross-selling the machine papers products to AGP's current customer base.

66.     On 1/9/97, First Boston issued a report, written by Romm, which raised the 1997 EPS forecast to $1.50 due to the Shade/Allied acquisition, based on information from Hanson and McAleer, and stated: "*The acquisition ... will be accretive immediately in 1997.*"

67.     The positive representations and statements made by Hanson and McAleer between 9/4/96 and 1/9/97, were each known to be or were recklessly disregarded by them as being false and misleading when made. The true facts, which they knew, but intentionally or were severely reckless in concealing – disclosure of which was necessary to make the statements not misleading – in addition to those set out at ¶¶23, 50, were that:

(a)     As former career Shade/Allied managers and industry experts explained, the Company paid far more for Shade/Allied than it was actually worth because computer-form paper was *not* a growth product. Rather, it was the mainstay of a dinosaur industry whose principal customer was the government. Indeed the demand for most of the products that Ampad manufactured was either declining, not growing much, or expected to decline in the future and form-

paper was the worst. Thus, it would be exceedingly difficult for Ampad to pass on rising production costs via higher customer prices because of this narrowing market for machine paper;

(b)     Shortly after the Shade/Allied acquisition, several members of top management – Gard, his deputy Executive VP Tim Needham, Purchasing VP Kevin Trischette, and Operations VP Thomas Dexter, who were instrumental in the acquisition and the purported integration with the Ampad division's operations – toured Shade/Allied facilities. They were told first-hand about integration problems, including rising costs, some of which were the result of the Company's policies. For example, its transportation directives about specific carriers and rates resulted in higher costs than what Shade/Allied paid in the past, while service quality deteriorated. Shade/Allied Transportation Director Chuck Waters specifically told the acquisition team, through Ampad's Transportation/Traffic Manager, about this and other integration issues, but the response was simple: Do not second-guess Company directives;

(c)     Ampad acquired Williamhouse in 10/95 and Niagra in 6/96, but when Shade/Allied was acquired eight months later, the Williamhouse/Niagra integration was still incomplete. Shipping managers and supervisors at the later-acquired Niagra and Shade/Allied observed that the Company was in disarray – "flying by the seat of its pants" – due, in part, to high turnover in the front offices as more and more local management responsibilities were transferred to Dallas. Moreover, product returns were so dramatic at both acquisitions that it appeared more was coming back than was going out;

(d)     Ampad did not implement uniform purchasing procedures among its different divisions post-acquisition. Thus, Williamhouse's purchasing and raw-material-inventory system was not as efficient as the Ampad divisions (including Shade/Allied), which conducted purchasing at the division level for all of its plants and had a stocking plant from which its various plants could draw raw materials as needed. In contrast, at the Williamhouse Division, which included Niagra, purchasing was conducted on a plant-by-plant basis that managers and Company executives knew to be much less efficient;

(e)     Shoddy internal controls and inventory-adjustment practices were still rampant at Williamhouse and Niagra even eight months after the latter acquisition. Not only did it

- 34 -

take many months to half-way integrate their operations with Ampad's, the end result was far from
successful;

(f)     Proprietary products of Williamhouse that utilized refined grades of paper
stock were fairly consistent in price, but commodity-grade products – its largest category – based
on pulp-grade paper were affected by fluctuations in raw-material costs. Customers knew about the
raw-material cost increases as soon as Williamhouse did, but they played Williamhouse and its
competitors against each other. As explained by national account executives, contrary to its 1995
price-protection policy, Ampad was forced to play "who's-going-to-blink first" with competing firms
to raise prices, which it desperately needed to do. But Ampad could not raise prices for its major
customers;

(g)     As directed by Company policy, Ampad division's personnel were responsible
for purchasing all non-paper raw materials, which included corrugated packaging, steel to be used
as wire in spiral notebooks, adhesives, film for window envelopes, rivets, clear PVC plastic for
plastic folders, and transparencies. All out-sourcing of finished goods, such as "fancy" stationary,
was sub-contracted to other manufacturers. The annual budget for purchasing of non-paper raw
materials during the Class Period was $265 million – significantly less than the budget and
expenditure for paper raw materials; and

(h)     As a result of these negative factors, Hanson and McAleer knew that their
1997 EPS forecasts of $1.30-$1.40, and 20%-30% EPS growth after that, being made by and for
Ampad were false when made, because such results were unachieveable.

68.     On 1/29/97, the Company's stock fell sharply to $22-3/4 from $26-1/2 the day before,
when rumors about weakening sales entered the market. On 1/29/97, Alex. Brown issued a report,
written by Vroom, based on discussions with Hanson and McAleer to support the stock price, who
Hanson and McAleer told Vroom about a "slight" revenue shortfall in 4thQ-96 revenues that had *no
impact* on core business or growth prospects. The report stated:

> We continue to recommend aggressive current purchase of AGP common
> shares especially in view of the share price weakness today. We remain convinced
> that American Pad & Paper is *singularly well positioned to benefit from the ongoing
> consolidation of the retail channel within the office products industry. The
> Company's core business remains solid* with persistent share gains continuing as

management's merchandising prowess and low cost production help drive sales. For 4Q 1996, however, we have modestly revised our revenue and EPS forecast *to reflect the loss of several commodity-grade paper orders from customers tightening inventory levels. We continue to forecast above-trend line EPS growth in both 1997 and 1998 ....*

\* \* \*

   \*   *We perceive neither a fundamental change in the business nor an adverse shift in AP&P's relationships with its customers.*

   \*   *Core business remains quite strong.*

   \*   *Our unchanged EPS estimate range of $1.30-1.35 for FY1997 does not reflect potential accretion from the announced acquisition of Shade-Allied....*

\* \* \*

   *Slight Revenue Miss Causes Us To Trim EPS Estimates.* A modest sales shortfall at retail in 4Q 1996 led to tightening of inventories, in our opinion, causing retailers to cancel some orders of commodity-grade items....

\* \* \*

   *Believe Staples/Office Depot Merger Will Prove Positive For AP&P.* AP&P is an important supplier to both Staples and Office Depot ... the pending merger of Staples and Office Depot *will benefit AP&P by enabling the Company to expand* ....

   69.   On 2/18/97, Ampad reported its 4thQ-96 results with revenues of $176 million, net income of $10.5 million, and EPS of $.36 (before an extraordinary item), pro forma net income of $11.3 million, and EPS of $.38, and its full year 96 results: revenues of $583 million, net income of $18 million, EPS of $.62 (before an extraordinary charge due to the early extinguishment of debt). The press release quoted CEO Hanson: "'[T]he company *performed exceptionally well during this critical phase*.'"

   70.   On 2/18/97, Ampad held a conference call for large shareholders, money and portfolio managers, analysts, brokers, and stock traders. Hanson and McAleer made presentations, answered questions, and had follow-up discussions, in which they stated:

   •   4thQ-96 revenue softness was due to short-term one-time issues and revenue growth was already showing up in new orders.

   •   fundamentals were on track and the Company's growth strategy was intact and on track.

   •   Ampad had been able to maintain strong gross-dollar profit margins despite lower retail prices.

- 36 -

- due to a slight delay in closing the acquisition, Shade/Allied would not add as much EPS in 1997 as earlier forecast, but it would still be accretive.

- Hanson, Gard, McAleer and other executives were successfully controlling costs, especially in the Williamhouse Division, and thus continued to expect EPS growth to exceed revenue growth.

- the Company was still in the process of making accretive acquisitions that would boost its 1997-98 EPS.

- there was no change in the fundamental growth characteristics and they still expected 12%-14% internally generated revenue growth, 25% on average EPS growth over the next three-five years, and at least 20% EPS growth sequentially during 1997.

- due to short-term factors – and not any significant problems with its business – the Company was now forecasting slightly lower EPS growth: 1997 EPS of $1.25-$1.35, 1998 EPS of $1.60-$1.70, and 20% annual EPS growth going forward.

71.    On 2/20/97, Alex. Brown issued a report written by Vroom, which was based on and repeated information provided in the conference call and follow-up conversations with Hanson and McAleer.  The report forecast 1997 EPS of $1.30-$1.35, 1998 EPS of $1.60-$1.65, and stated:

> **Fundamentals are on track.**

> * * *

> **Strong gross margin gains neutralized the revenue volatility .... AP&P's pricing policy enables it to manage gross profits regardless of high or low paper price levels.  We consider this to be a significant mitigant to the top-line volatility expected of a producer of paper products....**

> * * *

> **1997 EPS ESTIMATES UNCHANGED.  We've now incorporated $0.05 accretion from Shade-Allied in our 1997 EPS estimate ....**

72.    On 2/21/97, First Boston issued a report, written by Romm, which was based on and repeated information from the 2/18/97 conference call and follow-up conversations with Hanson and McAleer.  The report forecast 1997 EPS of $1.32, and stated:

> During the fourth quarter, American Pad & Paper stated that several key customers were working off inventories, **which had a modest impact on shipments**.

> * * *

> Since we are reviewing our 1997 estimate, **we want to be very clear that we remain optimistic about American Pad & Paper's ability to achieve strong growth in revenues and excellent improvements in cash flow and net income.**

> * * *

*At the margin level, we believe that American Pad & Paper will show stable gross margins but increased EBIT margins because of the continuing benefits of consolidating general and administrative expenses from its acquired companies.*

73.     On 2/26/97, Morgan Stanley issued a report, written by Bruce Missett, which was based on and repeated information from the 2/18/97 conference call and follow-up conversations with Hanson and McAleer. The report forecast 1997 EPS of $1.30, 1998 EPS of $1.70, and a 25% five-year EPS growth rate. The report upgraded Morgan Stanley's rating to "*Strong Buy*" and stated:

> *Acquisition Pipeline is Full - Management is still very much focused on accretive acquisition opportunities and announcements are likely over the next 12 months....*

* * *

> ... The stock price has dropped ... in the face of *no change in the fundamental growth characteristics of the company*....

74.     On 3/17/97, Morgan Stanley issued another report, written by Missett, which again forecast 1997 EPS of $1.30, 1998 EPS of $1.70, and a 20% five-year EPS-growth rate, based on discussions with Hanson and McAleer. The report stated:

> *Key investment positives have not changed since we initialed coverage in July 1996 ....*

* * *

> Growth Remains Strong with Core Customers .... AGP also continues to see *stronger growth ... from newly developed products*....

> *Acquisition Pipeline Is Full* Management is still very much focused on accretive acquisition opportunities, and we believe additional announcements are likely over the next 12 months. These should push up our earnings forecasts, since current estimates assume only internally generated growth.

75.     In late 3/97, the Company issued its 1996 Annual Report to Shareholders, which reported 1996 revenues of $583 million, net income of $18 million, and EPS of $.62 (before an extraordinary item relating to early extinguishment of debt). The report contained a letter signed by Hanson that stated:

> We were tough to beat as a private company and with our new access to capital *as a public company we will be even tougher*.

> Our business is to supply paper-based office products to those tough customers who dominate the industry:

> • Office Products Superstores (Office Depot, Office Max, Staples)

- Mega-retailers (Wal-Mart)
- National Contract Stationers (BoiseCascade Office Products, BT Office Products, Corporate Express, US Office Products)
- Paper Merchants (Nationwide, ResourceNet, Unisource, Zellerbach)
- Office Products Wholesalers (United Stationers and S.P. Richards)

\* \* \*

*One key to our strategy is to buy companies that expand or complement our national distribution channels, make products that we can cross-sell to existing distribution channels, increase our production capacities and provide products that are innovative and valuable to our customers....*

\* \* \*

*New products are another ingredient in our growth, providing strong margins for our company and our customers....*

\* \* \*

*... When we acquire a company, redundancies are eliminated and excess costs are brought in line. Our ability to recognize and capitalize on opportunities to improve efficiencies* makes AP&P one of the leanest companies in the industry, which allows us to offer customers very competitive prices.

76.    Elsewhere, the 1996 Annual Report stated:

*The reason AP&P's acquisition strategy has been successful is that the company makes the tough decisions when evaluating a target.*

*They made the right decision when they acquired Williamhouse.* The Williamhouse acquisition added a new product line – commercial envelopes – and distribution channel – paper merchants – to AP&P's strategy. Paper merchants sell envelopes to printers who print the envelopes, typically with corporate letterhead, for the end user. *AP&P is now the leader in this market.*

\* \* \*

*... As a successful consolidator, AP&P has merged seven management teams, sales forces, delivery fleets and back offices, into one company, creating a lean and efficient organization.*

77.    In late 3/97, the Company filed its Report on Form 10-K with the SEC, which included its 1996 financial results and was signed by CEO Hanson, COO Gard, CFO McAleer, and Ampad directors Gay, Lavine, Wolpow and Benson. The report stated:

*Paper Prices.* Paper represents a majority of the Company's cost of goods sold.... Beginning in January 1995, the Company adopted new pricing policies enabling it to set product prices consistent with the Company's cost of paper at the time of shipment. The Company believes *that it is now able to price its products so as to minimize the impact of price volatility on dollar margins.*

- 39 -

78.     The positive representations and statements made by Hanson, Gard, and McAleer, between 1/29/97 and late 3/97, were each known to be or were recklessly disregarded by them as being false and misleading when made. The true facts, which they knew, but intentionally or recklessly concealed – disclosure of which was necessary to make the statements not misleading – in addition to those set out at ¶¶23, 50, 57, were that:

(a)     the ongoing consolidation of the office-products retail channel into superstores was a negative trend because as smaller retail vendors were displaced, the Company's ability to achieve increased sales was negatively affected due to the superstore's sophisticated inventory-management practices;

(b)     the Company's acquisition pipeline was neither full nor was Ampad actively pursuing acquisitions that it had a reasonable probability of completing in the foreseeable future due to increasingly serious internal business problems. The Niagra and Shade/Allied acquisitions during the Class Period resulted in significant integration difficulties, which the Company had already faced and not resolved with Williamhouse;

(c)     the 2/97 Shade/Allied acquisition would not benefit the Company's EPS in the short-term because it would not be integrated for several months, and even then, due to weak sales and a shrinking customer base, and no long-term prospects for its key product – computer-form paper – it would not significantly affect Ampad's EPS in 1997;

(d)     National-account executives covered groups of states by regions and conducted sales meetings, trade shows, and consumer shows, servicing smaller accounts, including independent stationers and print shops, as opposed to the Company's high-volume customers such as superstores Staples or paper-merchant Unisource. These account executives facilitated numerous price changes over the years. In their experience, smaller accounts had to accept the Company's prices, but the high-volume customers, with unbeatable leverage, dictated the price they paid to Ampad;

(e)     National account executives knew that while the Company raised prices to key high-volume customers like Staples and Wal-Mart, it actually lost on those deals by providing significant rebates to them. According to national-account executives, all pricing decisions and

rebates were made directly by Hanson and Gard, joined by Sales VP Greg Pierce, who was responsible for large retail accounts such as Staples and Unisource, and Pricing Coordinator Keri Sibley, who met with Hanson and Gard regularly at Pricing Strategy and Internal Marketing meetings in Dallas;

(f)     According to a former Shade/Allied Plant Operations Administrator/Manager, raw-material shortages led to several months during the Class Period when production levels were very low, which was confirmed by division scheduler Richard Allison and, more simply, because the warehouses had so many empty spaces so often;

(g)     According to national-account executives, while the Company did undertake some efforts to develop new products, most of the mock-ups that were displayed at sales meetings seldom, if ever, actually went into production or were sold to customers. For example, the "Dilbert" product line was discussed at a sales meeting during the Class Period, but it never got to market. Many of Ampad's purportedly new products both during and after the Class Period were simply copies of existing products;

(h)     Product returns, including seasonal, promotional, and speciality items, were a chronic problem discussed with Ampad President Craig Stoudt by Ampad and Williamhouse Division executives. The return policy during the Class Period was exacerbated by the difficulty in absorbing returned goods. Even though some returned seasonal and speciality goods could be reworked and resold so long as there was not a retailer's brand name on them, reworking added significant labor and packaging costs, and the reworked goods were then usually sold to liquidators, such as Tuesday Morning, at below cost. In cases where there was a retailer's brand on the items, the returned goods had to be held in inventory until the following year when there would be attempts to resell them to the original customers. Wal-Mart, Staples, Office Max, and Office Depot routinely returned items, including the speciality items. Christmas, Easter and Thanksgiving-themed specialty products also represented especially large problematic returns from all major customers;

(i)     Product returns at Shade/Allied were frequent and consistent from Unisource, Office Max, and especially Staples, where truckloads went out and at least a couple of skids came back routinely. Unisource complained on numerous occasions to Shade/Allied sales managers and

supervisors that it was not being treated nearly as well as it had been before Ampad acquired Shade/Allied. Complaints from Unisource – and from other larger customers – about being shorted products often focused on poor quality, such as poor-fitting paper and difficult-to-rip machine papers;

(j)     Returned goods came back due to rampant over-shipments. For example, Niagra Plant Manager Coons in Denver instructed customer-service managers to issue credits to accounts without questioning whether the customer was actually allowed to return the goods because the computer system was in such disarray that it was difficult, if not impossible, to know for sure. Consequently, Niagara/Ampad had no idea if the customer had actually been over-shipped unless the customer voluntarily returned the unwanted excess. Williamhouse Division plant-operations and sales personnel presumed that many customers simply kept the excess and never informed the Company;

(k)     Because of information-system deficiencies, it was often impossible to construct an audit trail to accurately account for orders, shipments, and correct returns. Because of this, returns were increasingly allowed during the Class Period without return authorizations, which before the Niagra acquisition had been required. Efforts to reconcile physical inventory with computer-system data produced vast variances, which were "adjusted" in the computer system by accounting personnel, including Carlos Melendez, an inventory-discrepancy and adjustments employee at the Dallas corporate headquarters; and

(l)     As a result of these negative factors, Hanson, Gard and McAleer knew that the 1997 and 1998 EPS forecasts being made by and for Ampad and their forecasts of 25% EPS growth over the next three to five years were false and misleading when made.

79.     On 4/1/97, Ampad disclosed that its 1stQ-97 revenues would be about $149 million – *slightly* below earlier forecasts and blamed the shortfall on the "current consolidation activities in the office superstore market" and a "slight softening of paper prices." This disappointing announcement caused its stock to plunge from $16 on 3/31/97, to as low as $11-1/8 the next day. This stock-price decline was a matter of great concern to defendants – it came just nine months after the IPO. Thus, they mounted a strong effort to reinflate the stock price by minimizing the nature of

the 1stQ-97 shortfall and represented that Ampad's core business was strong, its growth prospects largely intact, and that it would show strong EPS growth in the second half of 1997. For instance, the 4/1/97 release stated that Ampad considered its 1stQ-97 results a "'*respectable operating performance,*'" it was "'*pleased with our ability to maintain operating margins in this environment,*'" and reassured investors that "'*the fundamental core business is sound.*'"

80.     On 4/1 and 4/2/97, Hanson and McAleer had conversations with analysts to reassure them that the 1stQ-97 shortfall was minimal, Ampad's core business strategy was working, and it was positioned to achieve strong 1997-98 EPS growth. During those conversations these executive stated:

- •     1stQ-97 softness was due to short-term, one-time "mechanical" issues, which would be overcome in second-half 1997, and products sell-through at retail remained strong.

- •     fundamentals were intact and business-growth strategy was on track.

- •     Ampad was able to maintain strong gross-profit margins, despite lower retail prices and paper-price hikes.

- •     Shade/Allied would be accretive to 1997 EPS.

- •     because management was successfully controlling costs, especially in the Williamhouse Division, EPS growth was expected to exceed revenue growth.

- •     increased inventory levels were not due to softening demand, but the result of a decision to build up inventory levels in anticipation of 2ndQ and 3rdQ sales.

- •     the Company would make acquisitions in the near term, which would boost its EPS.

- •     there was no change in the fundamental growth characteristics – Ampad still expected 12%-14% internally generated revenue growth, with at least 20% EPS growth sequentially during 1997.

- •     due to short-term factors – and not any significant problems – the Company was still forecasting 1997 EPS of $1.15-$1.35 (and very strong 3rdQ and 4thQ EPS), and 1998 EPS of $1.40-$1.70, with 15%-25% annual EPS growth going forward.

81.     On 4/2/97, Morgan Stanley issued a report, written by Missett, based on discussions with Hanson and McAleer which forecast 1997 EPS of $1.30, 1998 EPS of $1.70, a 20%-25% five-year EPS-growth rate, and *actually increasing 4thQ-97 EPS forecast from $.46 to $.47*.

> Slight shortfalls in Q1 – *with the emphasis on slight* – **appear to have been caused by** *mechanical timing issues of customer re-orders and NOT by a fundamental change in demand for AGP's products or services. Importantly, there is no change in the fundamental growth story behind AGP's business* ....

* * *

*Acquisition Pipeline is Full* – Management is still very much focused on accretive acquisition opportunities and announcements are likely over the next 12 months. We believe that the pipeline remains full.

82.     On 4/2/97, Alex. Brown issued a report, written by Vroom, based on discussions with Hanson and McAleer. The report stated the Company "*continues to be well-positioned long-term*," called the stock a "*strong buy*," forecast 1997 EPS of $1.30-$1.35, 1998 EPS of $1.60-$1.65, and stated:

> Another factor contributing to the lower-than-planned revenues is the March 1997 decline in uncoated free sheet prices initiated by the mills. We believe sales to paper merchants could be temporarily constrained by those customers delaying purchases in anticipation of further price declines. *We note that price declines would impact top-line growth but would not necessarily be negative to profitability since AP&P's arrangements with customers allows it to manage gross profit dollars*.

83.     That same day, Bankers Trust/BT Securities issued a report, written by Kanev, which upgraded Ampad to a "*strong buy*," forecast 1997 EPS of $1.15, 1998 EPS of $1.40, and a 15% secular-growth rate, after discussions with Hanson and McAleer. The report, which stated:

> Since March 26th, AGP's shares have declined almost 40%, from $18 1/4 to an intraday low of $11 1/8, before recovering to close at $13 7/8 per share.... [W]e believe most of the decline stemmed from investors' anxiety over the lack of information coming from management over the past several days.

> A press release late in the day yesterday *allayed some concern* when management pre-announced first quarter earnings of $0.15 - $0.16 per share, below our (and consensus') estimate of $0.17 per share. Slightly lower-than-expected sales during the quarter resulted primarily from reduced orders from major superstores customers in anticipation of the proposed Staples/Office Depot merger; a $0.01 paper price increase in March also contributed to slightly lower margins.

84.     As a result of these positive reassurances and forecasts of continued growth, the Company's stock rallied to close at $13-7/8 on 4/1/97, and started to move higher, reaching $19-7/8 on 5/7/97, recovering some of the ground that it had lost over the prior several months.

85.     On 4/21/97, Ampad reported its actual 1stQ-97 results: revenues of $149.8 million, net income of $4.7 million, and EPS of $.16 (excluding a consulting fee associated with the Niagara acquisition). The release quoted CEO Hanson:

> "We are *satisfied with our performance* in the first quarter, particularly considering the external business factors we experienced .... These included a substantial reduction of the planned flow of product to super stores due to the impact

- 44 -

of consolidation activities and a more conservative inventory strategy by our customers due to the perceived softening of uncoated free sheet. ***Despite these challenging market conditions we were able to maintain our gross profit margins***."

\* \* \*

"***Our acquisition pipeline is full. We believe the factors impacting sales this quarter are short-term ... and believe we are strategically positioned to achieve our long-term goals***."

86.    On 5/15/97, the Company filed its 1stQ-97 Report on Form 10-Q with the SEC, which was signed by McAleer, reported the earlier released financial results, and reiterated the IPO Prospectus Statement about paper prices and the 1995 pricing policies. The first-quarter report also stated that the increase "in inventories of $21.6 million [was] due to a buildup of inventory levels in anticipation of ***seasonal, promotional and new product sales in the second and third quarters***."

87.    On 4/21/97, the Company held a conference call for large shareholders, money and portfolio managers, analysts, brokers, and stock traders. During that call, Hanson and McAleer made presentations, answered questions, and had follow-up conversations, during which they stated:

•    1stQ-97 softness was due to short-term, one-time "mechanical" issues, which would be overcome in second-half 97. Products sell-through at retail remained strong.

•    fundamentals were intact and its business growth strategy was on track.

•    Ampad was able to maintain strong gross-profit margins, despite lower retail prices and paper-price hikes.

•    Shade/Allied would be accretive to 1997 EPS.

•    because management was successfully controlling costs, especially in the Williamhouse Division, EPS growth was expected to exceed revenue growth.

•    increased inventory levels was not due to softening demand, but the result of a decision to build up inventory levels in anticipation of 2ndQ and 3rdQ sales.

•    the Company would make acquisitions in the near term, which would boost its EPS.

•    there was no change in the fundamental growth characteristics – Ampad still expected 12%-14% internally generated revenue growth, with at least 20% EPS growth sequentially during 1997.

•    due to short-term factors – and not any significant problems – the Company was still forecasting 1997 EPS of $1.15-$1.35 (and very strong 3rdQ and 4thQ 1997 EPS), 1998 EPS of $1.40-$1.70, with 15%-25% annual EPS growth going forward.

88.    On 4/22/97, Morgan Stanley issued a report, written by Missett, based on and repeating information from the 4/21/97 conference call and follow-up conversations with Hanson

- 45 -

and McAleer. The report forecast 20% five-year EPS growth, 1997 EPS of $1.25, 1998 EPS of $1.70, and stated:

> We are reiterating our Strong Buy rating on American Pad & Paper because *we see no change in the underlying growth dynamics of AGP's core business* ....

> * * *

> Reported 1Q EPS of $0.16 were in line with recently revised expectations .... The shortfall from original expectations came on the revenue line (revenues were $150 million vs. our original expectation of $162 million) *and was caused by mechanical timing issues of customer reorders* – primarily due to the uncertainty surrounding consolidation in the superstore channel and continued pressure on paper prices – *and not any change in the underlying demand for AGP's products*....

> * * *

> *Acquisition Pipeline is Full.* Management is still very much focused on accretive acquisition opportunities, and announcements are likely over the next 12 months.... *[W]e believe management is in negotiations with a number of candidates.*

89. On 4/23/97, First Boston issued a report, written by Romm, based on and repeating information from the 4/21/97 conference call and follow-up conversations with Hanson and McAleer. The report forecast 20% five-year EPS growth, 1997 EPS of $1.25, 1998 EPS of $1.50, and stated:

> *The outlook for the remainder of the year is expected to improve significantly for the following reasons*:

> The Shade-Allied acquisition is completed and the full integration of the company will result in $3.0 million in cost savings during the second half of the year.

90. On 4/24/97, Bankers Trust/BT Securities issued a report, written by Kanev, based on and repeating information provided him by Hanson and McAleer in the 4/21/97 conference call and follow-up conversations. The report forecast 1997 EPS of $1.15, 1998 EPS of $1.40, estimated 15+% secular growth, and stated:

> We believe AGP is *well-positioned* to deepen these relationships [with its top 13 customers], given its broad product line and competitive prices. Management indicated that the company will increase the number of different products it will supply to Wal-Mart to 121 in the second quarter from 73 in the first quarter, and that about half of the Wal-Mart chain will be carrying its products.

> *AGP has a solid record in controlling costs, especially in the integration of its acquisitions.* The company expects about $3 million in cost savings in 1997 after full integration of Shade-Allied (acquired in January).

Finally, *we believe management could announce another acquisition during the year*, consistent with its intention to make one to two acquisitions per year.

91.     On 7/16/97, the Company reported extremely good 2ndQ-97 results:  net income of $5.4 million and EPS of $.18 (excluding a consulting fee associated with the acquisition of Niagara) – *ahead of expectations* – and quoted Chairman Hanson: "'*I am encouraged by our results in the second quarter as we grew sales 12% over the first quarter by continuing to expand our customer base as well as increase distribution of innovative products to our existing customers*....  We believe that the challenging market conditions experienced during the first half of the year *have stabilized* ....'"

92.     On 8/15/97, Ampad filed its 2ndQ-97 Report on Form 10-Q with the SEC, which was signed by McAleer, repeated the earlier reported results, repeated the paper-pricing policy statement issued in its IPO Prospectus and attributed increased inventories to "*a buildup in anticipation of seasonal, promotional and new product sales in the second half of the year*."

93.     On 7/16/97, the Company held a conference call for large shareholders, money and portfolio managers, analysts, brokers and stock traders.  During that call Hanson and McAleer made presentations, answered questions, had follow-up conversations, and stated:

•       industry conditions, which had contributed to Ampad's soft 4thQ-96 and 1stQ-97 revenues, were due to short-term, one-time "mechanical" issues that had been overcome.  The Company expected very strong growth in second-half 1997 and sell-through and retail remained strong.

•       fundamentals were intact and business-growth strategy was on track.

•       Ampad was able to maintain strong gross-profit margins even in the face of paper-price hikes, which had successfully been passed on to customers in 1997 to date.

•       management was successfully controlling costs, especially in the Williamhouse Division, and thus expected EPS growth to exceed revenue growth.

•       increased inventory levels were not due to softening demand, but the result of a deliberate decision to build up inventory levels in anticipation of much stronger 3rdQ and 4thQ sales.

•       the Company was still focused on making accretive acquisitions and would do so in the near term, which would boost its EPS.

•       there was no change in its fundamental growth characteristics – Ampad still expected 15%-25% EPS growth over the next three-to-five years and at least 20% EPS growth sequentially during 1997.

• due to short-term factors – and not any significant problems – the Company was still forecasting 1997 EPS of $1.21-$1.30 (and very strong 3rdQ and 4thQ-97 EPS), 1998 EPS of $1.50-$1.70, with 15%-25% annual EPS growth going forward.

94. On 7/17/97, Alex. Brown issued a report, written by Vroom, entitled "F2Q RESULTS CONFIRM EFFECTIVE STRATEGY," based on and repeating statements from the 7/16/97 conference call and follow-up conversations with Hanson and McAleer. The report forecast 1997 EPS of $1.21, 1998 EPS of $1.50, and stated:

> *The Company has successfully passed on paper price increases to its customers since implementing its pricing policy in January 1995, thereby mitigating the gross profit risk normally associated with such commodity fluctuations.*
>
> *Integration of the Shade-Allied acquisition is complete and results are exceeding the Company's cost-cutting objectives.*
>
> * * *
>
> ... In addition to carefully controlling SG&A expenses, *cost cutting objectives related to the Shade-Allied integration were ahead of expectations. That integration is now virtually complete* and the higher level of savings should be sustainable, in our view.

95. On 7/17/97, First Boston issued a report, written by Romm, based on and repeating statements from the 7/16/97 conference call and follow-up conversations with Hanson and McAleer. The report forecast 1997 EPS of $1.25, 1998 EPS of $1.50, and stated:

> *Tighter supply of uncoated free sheet paper is expected to raise prices again in August, it has been American Pad & Paper strategy to pass along the higher cost of paper at the time of invoice.* The net effect is that margins tend to lag in a rising paper market although the dollar profit margin remains the same.
>
> * * *
>
> *We believe that AGP has done an excellent job in integrating its acquisitions and making them accretive to earnings, as evidenced by the recent transactions of Niagara Envelope and Shade Allied.*

96. On 7/18/97, Morgan Stanley issued a report, based on and repeating statements from the 7/16/97 conference call and follow-up conversations with Hanson and McAleer. The report, entitled "ON TRACK FOR STRONG SECOND HALF," forecast 1997 EPS at $1.25, 1998 EPS at $1.70, a 20% five-year EPS growth rate, and stated:

> *Management says it remains very focused on pursuing acquisitions that will augment or extend their product line offerings.*

- 48 -

* * *

> ... We expect 2H gross margins to rebound to the 21-22% range due to *favorable mix shifts (sales of new, higher-margin machine paper SKUs begin to roll into results)* and manufacturing efficiencies....

> ... AGP had above-plan inventory levels going into the second quarter, due to 1Q sales shortfalls. In addition, AGP had to build up inventories to support the roll-out of its new product programs with Wal-Mart. Inventories totaled $144 million at the end of 2Q, up 37% from year-end. *We believe that these inventory levels are in line with the accelerated sales growth we expect to see in 3Q and 4Q.*

97.     On 8/1/97, Morgan Stanley issued a report, written by Sheelagh McCaughey, which continued to forecast 1997 EPS of $1.25 and 1998 EPS of $1.70, and 3rdQ-98 EPS of $.44 and 4thQ-97 EPS of $.47, along with a 20% five-year EPS growth rate, based on discussions with Hanson and McAleer, who reviewed the report and assured McCaughey it was accurate. After the report was issued, Ampad copied and publicly distributed the report. The report stated: *"Fundamental trends remain strongly in place .... Management remains very focused on acquisition opportunities."*

98.     As a result of the Company's purported very strong, above-expectation 2ndQ-97 results and Hanson's and McAleer's very favorable statements, assurances and forecasts, Ampad's stock price climbed back to $24-15/16 on 8/22/97 – close to its all-time high of $26-1/2.

99.     The positive representations and statements made and adopted by Hanson and McAleer between 4/1/97 and 8/22/97, were each known to be or were recklessly disregarded by them as being false and misleading when made. The true facts, which they knew, but intentionally or recklessly concealed – disclosure of which was necessary to make the statements not misleading – in addition to those set out at ¶¶23, 50, 67, 78, were that:

(a)     Increased inventories during the 1st and 2ndQ-97 were not the result of a deliberate decision to "build out" more product in anticipation of strong growth or seasonal demand. Rather, it was because the Company had accumulated millions of dollars of excessive inventory due to weak retail sell-through both in the Ampad Division, which manufactured writing pads, file folders, retail envelopes, and machine papers, and the Williamhouse Division, which included Niagra and manufactured business-envelope products – inventories that had to be sold at unprofitable prices;

(b)      In late 1997, Ampad was not in discussions about revisions to its bank-lending agreements to facilitate its ***growth in the near term***.  In fact, the business was not growing, but stagnating and contracting, and the discussions with lending banks resulted from a serious decline in the Company's financial condition which placed it on the verge of violating its bank-lending covenants;

(c)      Product returns at Ampad (including Shade/Allied) and Williamhouse Divisions (including Niagra) increased significantly throughout the Class Period to such an extent that it appeared as if more was coming back than was going out.  Customers returning goods included Staples, Nationwide and Dixon -- the latter two returned significant quantities nearly every other day, as many as four or five skids at a time.  Half of them were from customers' legitimate quality complaints such as weak glue, separating paper, and envelope windows in the wrong location.  Returns were accepted generally without return authorizations from the Customer Service Departments, which was supposed to be a prerequisite to accepting returns.  Shipping and receiving personnel were instructed to accept the returns to keep the customers happy.  Among the returned products were speciality items, such as holiday cards and wedding items for which no immediate re-sale market existed – the only option was to hold them until the following year;

(d)      One consequence of the large-scale product returns, rising raw-material costs, excess raw materials of some types and insufficient quantities of others, and declining-production rates, was that corporate headquarters directed that inventory minimums and maximums be increased dramatically.  The minimum was the mandatory quantity that was always to be on-hand.  If the quantity fell below the minimum, then new products were to be manufactured to bring the inventory level back above the minimum, but below the maximum.  On the other hand, the maximum was the product quantity that was allowed on-hand.  Purchasing and inventory managers reported that Ampad division increased their inventory minimums to make it appear as though there was a greater demand for products and that "they could not keep up with the orders." But purchasing, inventory, and shipping managers knew that the Company was getting much of its product back;

(e)      Hanson and Gard visited Shade/Allied's facilities at least every other month through the last 10 months of the Class Period. They typically spent a half to a full day performing

walk-throughs and addressing employees at plant-wide meetings, where they discussed operation plans and goals. They also met behind closed doors with plant managers. Shade/Allied Assistant Plant Manager Harold Wenger observed that product quality declined drastically after the Ampad acquisition. As part of a cost-cutting and consolidation initiative in Summer 1997, the Company closed Shade/Allied plants in Georgia and Washington and transferred production to facilities in Mississippi and Salt Lake City. Wenger was responsible for training the new press-roll operators, but he was given little more than *two weeks* to do so, even though adequately training a press-roll operator requires *six months*. Consequently, product-quality problems confirmed by Shade/Allied plant operations managers were common place, with poorly fitting and separating paper, which are more typical of poor training than poor raw-material quality. The Company also faced product-quality issues that were factors in the loss by Shade/Allied of the Staples business, a major account that Ampad expanded and then lost;

(f)     Former customer-service representatives at Niagra-Denver, who reported to Plant General Manager Dave Diverack, and then, through most of 1997, to Dave Coons, knew that, after Niagara was acquired by the Company, the Denver facility manufactured *some* products that had previously been manufactured by Williamhouse, but *there were no significant new products at any time during the Class Period*. And none of the existing Niagara product lines, even with the redundancies, were ever eliminated; and

(g)     Production levels also declined because Ampad installed an incompetent Production Chief at Niagra to lower-quality raw materials and a change in long-term suppliers. Moreover, there were repeated paper jams as a result of inexperienced mechanics at Shade/Allied – who could not be blamed because they did not receive the requisite *six months* training required to prepare them properly. Shipping supervisors and dock workers observed that the amount of shipped product declined from full to only partial truckloads.

100.     On 9/15/97, Ampad suddenly revealed that instead of the strong 3rdQ and 4thQ-97 revenue and EPS growth Hanson and McAleer had been forecasting, the Company would at best achieve flat revenues and would suffer a sharp decline in EPS during those quarters. Consequently, its stock price dropped sharply – from $24-3/8 per share on 9/15/97, to $11-1/2 per share over the

next five trading sessions as investors reacted to these startling revelations.  Nevertheless, in private discussions with analysts, Hanson and McAleer continued to forecast 1997 EPS of $.48-$.52. Moreover, even with the disappointing 3rdQ and 4thQ-97 results, they said *the Company would be profitable in both quarters* and achieve 1997 EPS of $.48-$.52 per share, while representing that its long-term growth prospects remained intact.  These statements were false.  In fact, Ampad was losing money from its operations and would suffer losses in 3rdQ-97, although it concealed this loss by manipulating and falsifying its financial statements as pleaded in ¶¶21-35.  And, due the severity of the problems, there was no basis whatsoever to forecast profitability in 4thQ or fiscal 1997.  In fact, the Company would eventually suffer losses in those periods as well.  But because of Hanson's and McAleer's shortfall in candor, the stock continued to trade at inflated prices throughout the balance of the Class Period.

101.   On 10/22/97, the Company reported its actual 3rdQ-97 results: revenues of $176.5 million, net income of $1.6 million, EPS of $.06, and quoted CEO Hanson: "Despite the current challenging market conditions, we remain confident that our strategy of offering broad product lines, higher value-added products, national distribution capabilities and reliable services positions us for the long-term as the supplier of choice to the office supply retailers."  And Ampad held a conference call for large shareholders, money and portfolio managers, analysts, brokers and stock traders. During that call Hanson and McAleer made presentations, answered questions, and had follow-up conversations, during which they stated:

   •   Ampad was still focused on making accretive acquisitions and *would do so in the near term,* which would boost its EPS.

   •   the Company still expected 12%-14% internally generated revenue growth and EPS growth over the next three-to-five years.

   •   it expected to report 4thQ-97 EPS of $.10-$.12, a profit for all of 1997 of $.48-$.52, and it was still forecasting EPS growth in 1998 to $.70-$.80, with 15%-25% annual EPS growth going forward.

102.   On 11/3/97, the Company announced that CFO McAleer had resigned "to pursue other interests."  One week later, knowing that Ampad had been falsifying its reported financial results for several quarters and that this would shortly be exposed, Hanson and Gard each sold off 50,000 shares – 20% of the stock they actually owned at $13 per share – allowing them each to

pocket $650,000 in illegal insider-trading proceeds. These sales took place just after Hanson forecasted that the Company would achieve 4thQ-97 profits and 1997 EPS of $.48-$.52, and when Hanson and Gard knew that financial results to date in 1997 had been phony and that Ampad would suffer a huge loss in the 4thQ and a loss for 1997 as a whole.

103.    On or about 11/14/97, the Company filed its Report on Form 10-Q for the third-quarter ended 9/30/97, signed by Controller William W. Solomon, which reported the same 3rdQ-97 financial results announced earlier, reiterated its paper-pricing policy stated in the 1stQ and 2ndQ reports, and stated:

> As part of the Company's *expected growth in the near term and in connection with certain potential acquisitions which may be completed in the next year*, the Company has commenced discussions with its lenders to increase the amount of borrowing capacity available under the revolving credit agreement and to modify certain debt covenants. The Company has been given preliminary oral indications the results of such discussions will be favorable....

104.    On 12/17/97, the Company revealed it would suffer *a 4thQ-97 loss of $.46-$.50 per share – so large that it would suffer a loss for the full year 1997*. The loss was due, in part, to millions in accounting charges to increase Ampad's LIFO reserve to reflect the affect of paper-price increases during 1997 and adjustments to its cost of goods sold. The Company revealed it had *not been able to increase prices* and, in fact, had been *discounting* prices to sell products. The stock price declined sharply on these revelations – from $12 per share on 12/16/97, to $7-3/4 on 12/18/97 – and it never recovered.

105.    On 1/10/00, involuntary Chapter 11 bankruptcy was commenced against Ampad, its subsidiaries and affiliates. On 1/14/00, the debtor converted the proceeding to a voluntary Chapter 11.

### FIRST CLAIM FOR RELIEF
### For Violation of Section 10(b) of the
### 1934 Act and Rule 10b-5 Against
### Hanson, Gard, Benson and McAleer

106.    Plaintiffs incorporate by reference ¶¶1-105.

107.    Hanson, Gard, Benson and McAleer knew or had access to the material, adverse, non-public information about Ampad's financial results and then existing business conditions, which was

- 53 -

not disclosed, and participated in drafting, reviewing or approving the misleading statements, releases, reports and other public representations of and about the Company.

108.   During the Class Period, these defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements alleged, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

109.   These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and the Class in connection with their purchases of Ampad's stock during the Class Period.

110.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ampad's stock. Lead Plaintiffs and the Class would not have purchased the Company's stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the 1934 Act**
**Against All Defendants**

111.   Plaintiffs incorporate ¶¶1-110 by reference.

112.   Hanson, the Company's Chairman and CEO, Gard, its Chief Operating Officer, McAleer, VP-Finance through 8/96 and then CFO until 11/97, Benson, Ampad's CFO through 8/96, its Executive VP and Director of Strategic Planning and Acquisitions through 12/31/96, and a Company director through the end of the Class Period, and Bain, the controlling shareholder both before and after the IPO, acted as controlling persons of Ampad within the meaning of §20(a) of the 1934 Act.  By reasons of their positions, including membership on the Company's Executive

Committee and control over the Board of Directors, each had the power and authority to cause Ampad to engage in the wrongful conduct alleged.

113.    Likewise, Gay, Lavine and Wolpow – plus Benson after 12/96 – acted as controlling persons of Ampad within the meaning of §20(a) of the 1934 Act.  During the Class Period, these four defendants held contemporaneous positions with the Company and its controlling shareholder Bain:

- Benson was a Company director and a Bain managing director from 1/97 to the end of the Class Period;

- Gay was a Company director and a member of its Executive Committee since 1992, and a Bain managing director since 1989;

- Lavine was an Ampad director since 1995, one of two members of its Audit Committee in 1995 and 1996, he has been with Bain since 1993, and a Bain managing director since 1997; and

- Wolpow was a Company director since 1995, a member of its Executive and Audit Committees in 1995 and 1996 and a Bain managing director since 1995.

Their dual positions dovetail with and are integrated to Bain's status as Ampad's controlling shareholder.  At the time of the 7/96 IPO, Bain owned 90% (13.4 million shares) of the Company's stock.  Following the IPO, Bain still owned 37% of the Company's stock, with these three Bain representatives on Ampad's Board of directors – later joined by Benson throughout 1997 – including two of them on the Company's four-member Executive Committee, which was comprised of Hanson, Gard, Gay, and Wolpow.  Throughout the Class Period, Bain controlled at least 50% of Ampad's Board, and, through a management contract, provided consulting and other financial and support services to the Company.

## CLASS ACTION ALLEGATIONS

114.    Lead Plaintiffs bring this action as a class action under Federal Rules 23(a) and (b)(3) on behalf of all persons who purchased Ampad's stock during the Class Period (6/25/96-12/17/96).  Excluded are defendants, members of their immediate families, and any entity in which a defendant has a controlling interest.

115.    Class members are so numerous that joinder of all is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During

the Class Period, Ampad had more than 27 million shares of stock outstanding, owned by hundreds of shareholders nationwide.

116.    There is a well-defined commonality of interest in the questions of law and fact involved in this case that predominate over questions that may affect individual Class members, including:

(a)    whether the federal securities laws were violated by defendants;

(b)    whether defendants omitted or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants acted with scienter;

(e)    whether the price of Ampad's stock was artificially inflated during the Class Period; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

117.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

118.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class-action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

120.    The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

### STATUTORY SAFE HARBOR

121.    The statutory safe harbor provided for forward-looking statements ("FLS") under certain circumstances does not apply to any of the allegedly false FLS pleaded.  Many of those statements were made in, or in connection with, Ampad's IPO.  The Safe Harbor also does not apply to false financial statements.  Neither were the FLS pleaded identified as "forward-looking

statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor did meaningful cautionary statements which identified important factors that could cause actual results to differ materially from those in the FLS accompany those FLS. Each FLS alleged was made by or authorized by Hanson, Gard, Benson or McAleer and was actually known by each of them.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action under Rule 23(a);

B.      Awarding Lead Plaintiffs and the Class members damages and post-judgment interest;

C.      Awarding extraordinary, equitable, or injunctive relief as permitted by law, equity, and federal statutory provisions invoked under Rules 64 and 65, and any appropriate state-law remedies; and

D.      Awarding such other relief as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: October 27, 2000                    STANLEY, MANDEL & IOLA, L.L.P.
                                           MARC R. STANLEY
                                           Texas State Bar No. 19046500
                                           ROGER L. MANDEL
                                           Texas State Bar No. 12891750

                                           MARC R. STANLEY

                                           3100 Monticello Avenue, Suite 750
                                           Dallas, TX  75205
                                           Telephone:  214/443-4301

                                           Local Liaison Counsel for Plaintiffs

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
California Bar No. 68581
G. PAUL HOWES
California Bar No. 187772
RANDALL J. BARON
California Bar No. 150796

_____
              G. PAUL HOWES

600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
California Bar No. 121590
MATTHEW P. MONTGOMERY
California Bar No. 180196

_____
              STEPHEN R. BASSER

402 West Broadway, Suite 850
San Diego, CA  92101
Telephone:  619/230-0800

Co-Lead Counsel for Plaintiffs

N:\CASES\AmerP&P\AMENDED.cpt