ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALLAN ZISHKA, et al., On Behalf of Themselves and All Others Similarly Situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>AMERICAN PAD AND PAPER COMPANY, ) et al., )<br><br>Defendants. ) | Civ. No.: 3-98CV0660-M<br><br>CLASS ACTION<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' CLAIMS UNDER SECTION 20(A) OF THE 1934 SECURITIES AND EXCHANGE ACT |

154

TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF FACTS..................................................................................2

III.    ARGUMENT.....................................................................................................11

        A.      Plaintiffs Have Properly Alleged Defendants' Violation of Section 20(a)............11

        B.      Plaintiffs Need Not Allege Knowing Misconduct.................................................16

        C.      Plaintiffs Have Established Underlying 10b-5 Violations.....................................17

IV      CONCLUSION.................................................................................................18

TABLE OF AUTHORITIES

<u>Cases</u>

<u>Abbot v. Equity Group, Inc.</u>
    2 F.3d 613, 620n.18 (5th Cir. 1993)..............................................................11, 15

<u>Cameron v. Outdoor Resorts of America</u>
    608 F.2d 187, 195 (5th Cir. 1979)...................................................................15

<u>Dennis v. General Imaging, Inc.</u>
    918 F.2d 496, 509 (5th Cir. 1990)...................................................................11,12

<u>Dyer v. Eastern Trust Banking Co.</u>
    336 F.Supp. 890 (N.D. Maine 1971)..............................................................14

<u>G.A. Thompson & Co. v. Partridge</u>
    636 F.2d 945, 959 (5th Cir. 1981)..........................................1, 11,12, 14,15,16

<u>Jaffe v. Bosco</u>
    1996 WL 727981, *6 (N.D. Tex. 1996)...........................................................12

<u>McNamara v. Bre-X Minerals Ltd.</u>
    46 F. Supp. 2d 628, 638 (E.D. Tex. 1999)..........................................11, 12, 15

<u>Myzel v. Fields</u>
    386 F.2d 718 (8th Cir. 1967)........................................................................14

<u>Safeway Portland Employees' Federal Credit Union v. C.H. Wagner, Jr. Co., Inc.</u>
    501 F.2d 1120 (9th Cir. 1974)......................................................................14

<u>Rochez Brothers Inc. v. Rhoades</u>
    527 F.2d 880 (3d. Cir. 1975).........................................................................14

<u>Statutes, Rules and Regulations</u>

15 U.S.C.
    §78u-4(f)(2)(A)...............................................................................................17

17 C.F.R.
   §230.405(f)(1979).........................................................................................................11

1934 Securities Exchange Act
   Section 20(a)...................................................................................1, 11, 16, 18

<u>Other</u>

H.R. REP. NO. 104-369 at 37 (1995)...........................................................................16

S. REP. NO. 104-98, at 20 (1995)...............................................................................16

I.      INTRODUCTION

Section 20(a) of the Securities and Exchange Act of 1934 is a simple statute.  It renders control persons liable for the securities violations of those they control.  This liability is solely based upon defendants' status as control persons and requires no action whatsoever on their part. Although section 20(a) imposes broad liability, it provides defendants with an affirmative defense: if they can prove that they acted in good faith and did not induce the violations in question, they will not be liable.  However, once their status as control persons is established, the burden is on defendants.

In this case, there can be no doubt that defendants were control persons.  They include AMPAD's largest shareholder, Bain Capital, which controlled half of the Board of Directors, as well as the top officers and directors of the Company.  If defendants did not control AMPAD, no one did.  Unable to deny their control, defendants argue that, in addition to control, plaintiffs must also allege that defendants participated in the underlying violations or that they actually exercised their control.  The Fifth Circuit has explicitly held that such allegations are unnecessary.  *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 959 (5th Cir. 1981).  Defendants may argue, as an affirmative defense, that they did not participate in the violation, but plaintiffs need not allege such participation.

Defendants also contend that the Amended Complaint is defective because it fails to allege that defendants acted with knowledge.  However, under both 20(a) and Fifth Circuit law, defendants' liability is predicated upon their ***status as control persons, not their actions.***  Since

1

plaintiffs need not allege that defendants acted at all, they certainly do not need to allege that defendants acted with knowledge.

As demonstrated in plaintiffs' brief in opposition to the dismissal of the 10b-5 claims, the Amended Complaint states a claim for violations of 10b-5. As control persons, defendants are liable for those violations.

## II.    STATEMENT OF FACTS

In 1992, defendants Hanson, Gard and Bain Capital ("Bain") purchased American Pad and Paper Company ("AMPAD" or "Company"), a manufacturer and seller of writing pads, file folders, index cards and envelopes to office products distributors, in a leveraged buyout ("LBO") from Mead Corporation ("Mead") with short term financing from Mead. Bain, Hanson and Gard invested three million dollars of their own capital -- $2.85 million by Bain[1] and $280,000 by Hanson and Gard -- and borrowed almost all the rest from Mead, leaving AMPAD saddled with a huge acquisition debt. When AMPAD lost over $22 million during 1994-95, the Company could barely service, let alone repay, its massive LBO debt. ¶2.

By mid-1995, the LBO was in danger of failing. AMPAD had accumulated a *negative* shareholders equity of 66 million dollars and the book value Hanson's, Gard's and Bain's shares was a negative ($17.06) per share. Thus, if the collapse of the Company's floundering LBO was to be avoided, defendants needed to raise cash to pay down the oppressive debt. An IPO was the

---

[1]Bain acquired 13.4 million shares -- 90% of AMPAD stock. Mindful of its significant equity position and capital investment, Bain controlled at least 50% of AMPAD's Board throughout the Class Period and, through a management contract, provided consulting and other financial and support services to the Company and positioned itself to dictate the Company's conduct. ¶1   The Bain surrogates holding contemporaneous positions with AMPAD and Bain were individual defendants Benson (from January to the end of the Class Period), Gay, Wolpow and Lavine

2

only way to salvage the LBO, payoff investment bankers, bail the defendants out of a dangerous financial situation, and create a trading market in the Company stock. ¶3.

Executing an IPO presented an enormous challenge, however, because demand for AMPAD products was declining. The Company lost $7 million in 1994 and $15 million in 1995, due, in part, to decreasing prices and decreasing demand. In order to ensure the success of the IPO, it was necessary to make AMPAD appear to be a "growth" company in a "growth industry." ¶4. In October 1995, as part of the effort to launch a successful IPO and create the appearance of profitability, the Company's LBO debt was restructured, Mead was paid off using investment-banker loans, and envelope manufacturer WilliamsHouse was acquired. Once this was accomplished, AMPAD filed its Registration Statement on June 25, 1996, which included its IPO prospectus (the "Prospectus"). The Prospectus, signed by Hanson, Gard, Benson and three Bain representatives on AMPAD's Board of Directors -- Wolpow, Lavine and Gay -- emphasized the Company's "strategy", stressed its "competitive strengths" claimed that it provided "continued opportunities for growth and profitability" and stated that it planned to follow the WilliamsHouse acquisition with even more acquisitions that would boost the Company's growth. ¶5. *The Prospectus further emphasized and represented that AMPAD's new pricing policies would minimize the impact of fluctuating raw material prices.* ¶28(c).

The statements in the Prospectus were false. AMPAD's prices to customers were fixed, irrespective of the cost to AMPAD of raw materials. Thus, the Company was not insulated from raw material costs fluctuations as it claimed. Nor was the Company truly able to expand

3

significantly through acquisitions since it had neither the expertise nor the capital to integrate existing operations into its own.   ¶43.   In fact, AMPAD had still not fully integrated WilliamsHouse, which it had acquired in October 1995, by the time of the IPO.  Although the Prospectus identified several risk factors which could adversely affect AMPAD going forward, including the fluctuating raw material costs and potential difficulties in acquiring and integrating new businesses, in fact, these adverse developments *had already occurred* by the time the Prospectus was issued -- rendering the risk factor "warnings" themselves false, deceptive and misleading.  ¶¶38, 43.

The IPO was a tremendous success as a result of these false statements.  AMPAD sold 12.5 million shares at $15 per share.  Bain sold 3.5 million shares for a $49 million return on its initial $2.85 million investment.  AMPAD's IPO proceeds, $172.8 million, were used to pay off its huge LBO debt and save the Company from financial collapse, at least for the time being. ¶44.

Thereafter, defendants Hanson, Gard, McAleer and Benson (who remained with AMPAD until September 1996 and then joined Bain) continued to make false statements regarding AMPAD. Company Press Releases and statements disseminated through securities analysts heralded the "successful acquisition of WilliamsHouse", the achievement of "profitability goals," assured the market that the Company was "on target with new product introductions and market penetration to our fast growing key customers," and represented that "costs savings programs continue to reap results." ¶¶45, 46, 56, 57. Defendants represented that AMPAD had *successfully implemented new pricing strategy which would shield its earnings from the volatility of paper prices* and that the

4

Company's special relationships with paper mills continue to provide it with important purchasing advantages. ¶¶42, 46, 70, 71, 77.

Defendants also represented that the Company's financial results were on plan, business momentum was strong, and AMPAD was uniquely well-positioned to benefit from the growth of the superstore retail office products distribution channel. With regard to AMPAD's acquisitions, defendants stated that WilliamsHouse sales were growing strongly, that Niagara was being successfully integrated and that the January 7, 1997 acquisition of Shade/Allied would be accretive to earnings. ¶¶57, 62-66, 70.

Even after the company stock fell sharply to 22¾ from 26½ on January 29, 1997, amid rumors about weakening sales, defendants Hanson and McAleer buoyed the stock price by downplaying any problems. They reported a "slight" revenue shortfall in 4Q96 that they stated had no impact on core business or growth prospects. Defendants' statements induced an analyst from Alex Brown to report that AMPAD was singularly well-positioned to benefit from the ongoing consolidation in the retail office products industry, that the Company's core business was solid, and that AMPAD had not suffered any fundamental change in the business nor an adverse shift in relationships with customers. ¶68.

On April 1, 1997, AMPAD disclosed that it would suffer a shortfall of 1Q97 revenues from earlier forecasts, which it blamed on "current consolidation activities in the office superstore market" and a "slight softening of paper prices." This announcement caused its stock to plunge from 16 on March 31, 1997 to as low as 11-1/8 the next day. In response, the Company launched

5

a strong effort to re-inflate the stock price by minimizing the nature of the 1Q97 shortfall, again reiterating that AMPAD's core business was strong, its growth prospects largely intact, reassuring investors that "the fundamental core business is sound." ¶ 79. Hanson and McAleer assured market analysts that 1Q97 softness was simply due to short-term one-time "mechanical" issues which would be overcome in the second half of 1997, that Shade/Allied would be accretive to 1997 EPS, that costs were being successfully controlled, and that increased inventory levels were not due to softening demand. ¶79. When AMPAD reported its 1Q97 results in a release on April 21, 1997, CEO Hanson was quoted as stating "we are satisfied with our performance in the first quarter" and "despite these challenging market conditions, we were able to maintain our gross profit margins," adding "our acquisition pipeline is full" and "the factors impacting sales this quarter are short-term . . . we are strategically positioned to achieve our long-term goals." ¶85.

On July 16, 1997, upon reporting extremely good 2Q97 results, AMPAD assured investors that the "challenging market conditions experienced during the first half of the year have stabilized." ¶91. On August 15, 1997, AMPAD filed its 2Q97 report on Form 10Q with the SEC, signed by McAleer, which repeated the paper pricing policy statement contained in the IPO prospectus, and stated that increased inventories were attributed to "a buildup in the anticipation of seasonal, promotional and new product sales in the second half of the year." ¶92. AMPAD's stock reached to an all-time high of $26.50 a share on August 22, 1997. ¶98.

On September 15, 1997, AMPAD suddenly revealed that instead of the strong 3Q and 4Q97 revenue and EPS growth Hanson and McAleer had been forecasting, the Company would, at best,

6

achieve flat revenues and suffer a sharp decline in EPS during those quarters. Its stock declined sharply from 24-3/8 per share on September 15, 1997 to 11½ per share over the next five trading sessions. Nonetheless, Hanson and McAleer continued to forecast 1997 EPS $.48-$.52 and, despite the disappointing 3Q and 4Q97 results, stated that the Company would be profitable in both quarters, while representing that its long-term growth prospects remained intact. On October 22, 1997, while reporting its actual 3Q97 results, Hanson and McAleer told analysts that the Company would make an accretive acquisition in the near term which would boost EPS, and that they still expected that they expected to report 4Q97 EPS of $.10-$.12. ¶¶100-101.

As more fully alleged in the Amended Complaint, ¶¶21-35, 43(a)-(k), 50(a)-(g), 67(a)-(h), 78(a)-(1) and 99(a)-(g), each of the foregoing statements and reported financial results were false, deceptive and misleading. For example, as more fully alleged at ¶¶21-35, Hanson, Gard, McAleer and Benson caused the Company to camouflage its declining performance by issuing false financial statements for 2Q96, 3Q96, 4Q96, 1Q97, 2Q97, and 3Q97. These financial results violated AMPAD's own publicly-represented revenue recognition practice and GAAP. AMPAD's revenues were artificially inflated by the premature and *improper recognition of revenue on goods that were not yet shipped and, in some cases, not even manufactured.* ¶27. AMPAD also booked revenue on sales to customers which had been granted the right to return unsold product -- a practice that caused AMPAD to suffer huge product returns and which ultimately lead, in part, to a huge $13.4 million charge in December 1997.

7

As competitive pressures decreased the prices that AMPAD could charge customers for finished products, AMPAD manipulated its ending-inventory valuation.[2]  This accounting impropriety was ultimately corrected in December 1997, when the Company was forced to incur more than $6 million to adjust LIFO reserve for 1997 raw material price increases.  ¶¶28-32. Further, AMPAD continuously *underreported costs of sales* since acquiring WilliamsHouse's unreliable and faulty reporting system -- causing AMPAD to overstate AMPAD's gross profit and net earnings.  ¶32.

AMPAD's representation that it had successfully implemented a pricing strategy that would protect its gross-dollar profit margins from raw material paper price fluctuations was a blatant falsehood.  AMPAD's need to retain its major customers meant that it could not raise its prices, and had no protection against increasing raw paper prices.  ¶67(f).  Indeed, on December 17, 1997, the company admitted that it had not been able to increase its prices in the face of increasing raw material paper prices and, conversely, had been forced to provide its customers a discount to induce them to buy. ¶104.

WilliamsHouse's condition was chaotic at best, with erratic internal controls, unfilled orders arising from an inability to obtain sufficient quantities of raw materials, a high volume backlog of unpaid vendor payables, and unaccounted-for and excess inventory.  Persistent raw material inventory accounting problems caused false inventory reporting, exacerbated by Niagara's computer

---

[2]AMPAD decreased, rather than increased, LIFO reserves, even in the face of severe increased raw material costs. Eliminating LIFO reserves altogether on December 31, 1996, added $8.05 million in gross profit and pre-tax earnings to FY96 results -- causing the reported cross-margin to be 23.2% for 4Q96 versus 18.7%.

system, caused former customer service representatives and managers to report that "nobody knew what we had in inventory." ¶¶50(a)-(f).

AMPAD's representation that the Shade/Allied acquisition - the only one it consummated during the Class Period - would be immediately accretive to earnings and meet the company's cost-cutting objectives, ¶62-66, 70, 87, 94, was patently untrue. Gard toured the Shade/Allied facilities and learned firsthand from Shade/Allied representatives, including Transportation Director Chuck Waters, of rising costs, deteriorating service quality and excessive transportation costs. Shipping Managers observed that the Company was "flying by the seat of its pants." ¶67(a)-(d), ¶78(c). As with the problems at WilliamsHouse, the problems with Shade/Allied were critical to AMPAD's core operations.

Defendants falsely claimed that AMPAD was uniquely positioned to capitalize on the consolidation of office superstores. ¶¶36, 39, 40, 46, 48, 49, 51, 54, 56, 57-61, 68, 70. In truth, the ongoing consolidation of the office products retail channel into superstores was negatively affecting AMPAD's ability to increase sales. The superstores' sophisticated inventory management practices and volume purchasing leverage actually put manufacturers and vendors such as AMPAD at a disadvantage. ¶43(j). AMPAD was particularly vulnerable because it offered neither distinctive products nor significant competitive or purchasing advantages. ¶43(j). As a consequence, AMPAD experienced significant and escalating product returns. The amount of shipped products declined during the Class Period from full to only partial truckloads, while high-volume customers leveraged

9

- indeed dictated - favorable price terms and rebates to their benefit.  ¶¶50(f)b, 78(a)-(e), 78(h), 78(i), and 99(g).

AMPAD was descending further into bankruptcy was on the verge of violating bank-lending covenants as it experienced significant large-scale product returns, including whole skids returned from major accounts such as Unisource, OfficeMax and especially Staples. ¶78(h)-(l).

In November 1997, the Company announced its CFO McAleer had resigned "to pursue other interests." One week later, aware that AMPAD had been falsifying its reported financial results for several quarters and that this would shortly be exposed, Hanson and Gard each sold off 50,000 shares — 20% of the stock they actually owned at $13 per share — allowing them to each pocket $650,000 in illegal insider-trading proceeds. These stock sales took place just after Hanson forecast that the Company would achieve 4Q97 profits and 1997 EPS of $.48-$.52. Hanson and Gard knew that the financial results to date in 1997 had been phony, and that AMPAD would suffer a huge loss in 4Q and a loss for 1997 as a whole. ¶102.

Suddenly, on December 17, 1997, the Company shocked the investment community, revealing that it would suffer a 4Q97 loss of $.46-$.50 per share — so large that it would suffer a loss for the full year 1997. The loss was due, in part, to millions in accounting charges needed to increase AMPAD's LIFO reserve to reflect the effect of paper price increases during 1997 and adjustments to its costs of goods sold. The Company revealed that it *had not been able to increase prices* and, in fact, had been *discounting* prices to sell products. Following this revelation, AMPAD's stock collapsed to 7¾ per share, and continued to decline until the Company ultimately

10

declared bankruptcy and all shareholder value was wiped out. Thus, the only shareholders who profited from investing in AMPAD were Hanson, Gard and Bain.

III.    ARGUMENT

   A.    Plaintiffs Have Properly Alleged Defendants' Violation of Section 20(a)

The Amended Complaint alleges that each defendants was a control person during the Class Period. That is all that is required. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The Fifth Circuit considered the application of this statute in *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945 (5th Cir. 1981):

> The term "control" . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. 17 C.F.R. § 230.405(f) (1979). Neither this definition nor the statue appears to require participation in the wrongful transaction. Fifth circuit case law appears to follow the plain meaning of the statute in this respect. Lack of participation and good faith constitute an affirmative defense for a controlling person. It is important to separate control from the good faith defense since the burden of proof with respect to the latter is on the defendant while the burden of establishing control is on the plaintiff.

*Id.* at 959 (citations omitted).[3]  *See also*, *MacNamara v. Bre-X Minerals Ltd.*, 46 F. Supp. 2d 628,

---

[3] A subsequent Fifth Circuit decision, *Dennis v. General Imaging, Inc.* 918 F.2d 496, 509 (5th Cir. 1990), incorrectly states that *Thompson* requires defendants' participation to establish a 20(a) violation. The Fifth Circuit rectified this error in *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620n.18 (5th Cir. 1993) ("*Dennis* does not accurately reflect our rejection in *Thompson* of a 'culpable participation' requirement.") Despite this clarification, defendants have cited a

11

638 (E.D. Tex. 1999)("[I]t is enough if the Defendant simply had the abstract power to control. Actual exercise of that power is not required."); *Jaffe v. Bosco*, 1996 WL 727981, *6 (N.D. Tex. 1996) (the court [in *Thompson*] rejected the contention that actual participation in the transaction underlying the violation was a prerequisite for a prima facie case.").

Plaintiffs have made the following allegations regarding defendants' control:

- Defendant Hanson was Chairman of the Board of Directors, CEO, a member of AMPAD's Executive Committee, and owned 250,000 of AMPAD stock. ¶10(a).

- Defendant Gard was Chief Operating Officer, a member of the Board of Directors, and an Executive Committee member, and owned 250,000 shares of AMPAD stock. ¶10(b).

- Defendant Benson was Executive VP and Director of Strategic Planning and Acquisitions through 1996. He was CFO of AMPAD through August 1996, when he resigned to join Bain as a managing partner. He was also a member of AMPAD's Board of Directors through the Class Period, even after he joined Bain. ¶10(c).

- Defendant McAleer was VP of Finance until August 1996, and AMPAD's CFO thereafter until he resigned in November 1997. ¶10(d).

---

number of District Court cases in the Fifth Circuit which mistakenly follow *Dennis*, instead of *Thompson* and *Abbott*, which were the controlling authority. Because the Fifth Circuit has mandated a different approach than other jurisdictions (see *McNarmara* at 637n.12), defendants' authorities from outside this circuit are inapplicable.

- Defendants Hanson, Gard, Benson (to September 1996), and McAleer were AMPAD's highest-ranking officers, and each had direct involvement in its everyday business, were privy to confidential information, and were involved in drafting, reviewing, or disseminating the alleged misleading statements. ¶13.

- Defendant Gay was a member of the Board of Directors, and Executive Committee member since 1992, and a Bain managing director since 1989. ¶11(a).

- Defendant Lavine was a member of the Board of Directors since 1995, has been with Bain since 1993, and has been a managing director at Bain since 1997. He was one of two members of the Company's Audit Committee in 1995 and 1996. ¶11(b).

- Defendant Wolpow was a member of the Board of Directors since 1995, an Executive and Audit Committee member in 1995 and 1996, and has been a Bain managing director since 1995. ¶11(c).

- Defendant Bain, including Bain Venture Capital, owned 13.4 million shares of AMPAD, accounting for 90% of its stock, before the IPO. It also had three to four representatives on AMPAD's Board of Directors through the Class Period, including two members of AMPAD's four-member Executive Committee and both members of its Audit Committee during 1995-96. Three of the six signatories to the June 1996 IPO Registration Statement were Bain representatives. Even after selling $49 million worth of AMPAD stock in the IPO, Bain continued to own 38.5% of the outstanding AMPAD stock and had up to four representatives on the Board.

13

Throughout the Class Period, Bain controlled at least 50% of AMPAD's Board and provided consulting and other financial services to the Company pursuant to a lucrative management contract. ¶12.

These allegations clearly establish all defendants as control persons. In *Thompson*, the Fifth Circuit held:

Uncontroverted evidence showed that Presley was not only a 24% stockholder and an officer and director, but was apparently involved in the day-to-day coordination of the loan gathering. . . . [T]his evidence established that Presley had the requisite power to directly or indirectly control or influence corporate policy. *See also, Safeway Portland Employees' Federal Credit Union v. C.H. Wagner, Jr. Co., Inc.*, 501 F.2d 1120 (9th Cir. 1974) (summary judgment against two of three directors affirmed on the grounds that each was one of three directors [sic] the third director was not a defendant); *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967) (ability to influence is sufficient); *Dyer v. Eastern Trust and Banking Co.*, 336 F. Supp. 890 (N.D. Maine 1971) (prima facie case made out when defendants shown to be one of 12 active directors controlling corporation) ; cf. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975) (ability to influence is relevant).

*Thompson* at 958.

Defendants in this case easily meet the standard for control set out in *Thompson*. Every one of them was a member of AMPAD's Board. Hanson, Gard, Benson and McAleer were also the highest ranking officers of the Company, ran its day-to-day operations, and approved the misleading statements at issue. Bain controlled at least half of AMPAD's Board at all times and owned between 38.5% and 90% of its stock throughout the Class Period. These defendants are clearly control persons. If they are not, it is difficult to imagine who would qualify.

14

Defendants argue that, in addition to having the power to control the primary violators, plaintiffs must also allege that 20(a) defendants actually exercised that power. Defs' Mem. at 10-14. This is another way of saying that defendants' status as control persons is not enough and that defendants must have participated in a violation to be liable. As discussed *infra, Thompson, Abbot*, and *McNamara* are absolutely clear that the Fifth Circuit does not require participation by defendants; their status as control person is enough. *Cameron v. Outdoor Resorts of America*, 608 F.2d 187, 195 (5th Cir. 1979), cited by defendants, holds only that a CEO's exercise of power was relevant in evaluating his affirmative defense of good faith. The Court in *Cameron* was not considering the sufficiency of a complaint.

Because the Amended Complaint alleges facts establishing all of the defendants as control persons, it states a claim against each of them under Section 20(a) and *Thompson*. At summary judgment or trial, defendants will be entitled to produce evidence in support of an affirmative defense that they acted in good faith and did not induce the violations in question. For the purposes of this proceeding, however, a *prima facie* case has been alleged.

B.    Plaintiffs Need Not Allege Knowing Misconduct

Defendants argue that because 20(a) provides for joint and several liability, and because the PSLRA requires a showing of knowledge to establish joint and several liability, and because the PSLRA requires a complaint to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, then plaintiffs must allege defendants' knowledge with particularity under Section 20(a). This argument is tenuous at first glance and completely

without merit upon further inspection. In fact, defendants are unable to cite a single case to support it.

Imposing a knowledge requirement upon 20(a) claims makes no sense. Under *Thompson*, a 20(a) defendant is rendered liable solely by his or her status as a control person. Since the statute does not require defendants to have acted at all, it is absurd to contend that they must have acted with knowledge.

The legislative history of the PSLRA is in accord. The PSLRA requires a knowing violation before imposing joint and several liability because Congress deemed it unfair that "a single defendant who has been found to be 1% liable may be forced to pay 100% of the damages in the case." H.R. REP. No. 104-369 at 37 (1995). *See also* S. REP. No. 104-98 at 20 (1995) ("A defendant found responsible for only 1% of the harm could be required to pay 100% of the damages."). However, the liability of 20(a) defendants is ***already*** limited. Section 20(a) explicitly states that the liability of a control person cannot exceed the liability of the controlled person. As such, the rationale behind the PSLRA's limitation on joint and several liability is inapplicable to 20(a). Surely, if Congress had intended to further limit the controlling person's liability under 20(a), it would have explicitly said so.

Beyond the fact that knowledge is not an element of a 20(a) violation, it is an issue that cannot be addressed at the pleading stage. Under *Thompson*, the state of mind of 20(a) defendants is not relevant unless and until they assert, as an affirmative defense, that they acted in good faith and did not induce the violation in question. *Thompson* at 959-960. Similarly, the PSLRA states:

16

"[a]ny person *against whom a final judgment is entered* in a private action shall be liable for damages jointly and severally only if the *trier of fact* specifically determines that such covered person knowingly committed a violation of the securities laws."   15 U.S.C. §78u-4(f)(2)(A) (emphasis added).   Clearly, to the extent these provisions render defendants' state of mind relevant, they are intended to be applied at trial, not on a motion to dismiss.

      C.    Plaintiffs Have Established Underlying 10b-5 Violations

The Amended Complaint properly alleges primary violations of 10b-5.   For a discussion of this issue, plaintiffs direct the Court to Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motions To Dismiss Plaintiffs' 10b-5 Claims.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IV.    CONCLUSION

For the above reasons, plaintiffs respectfully request that the Court deny defendants' motions to dismiss plaintiffs' 20(a) claims in their entirety.

DATED: 1/31/01 _____

Respectfully submitted,

STANLEY, MANDEL & IOLA, L.L.P.
MARC R. STANLEY
Texas State Bar No. 19046500
ROGER L. MANDEL
Texas State Bar No. 12891750

_____
      ROGER L. MANDEL
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone: (214) 443-4301
Facsimile: (214) 443-0358

Liaison Counsel for Plaintiffs:

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
California Bar No. 68581
G. PAUL HOWES
California Bar No.187772
RANDALL J. BARON
California Bar No. 150796

_____
      G. PAUL HOWES

600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

18

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
California Bar No. 121590
MATTHEW P. MONTGOMERY
California Bar No. 180196
402 West Broadway, Suite 850
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile: (619) 230-1874


_____
STEPHEN R. BASSER

FINKELSTEIN & KRINKS, LLP
HOWARD D. FINKELSTEIN
California Bar No. 102964
JEFFREY R. KRINSK
California Bar No. 109234
501 West Broadway, Suite 1250
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

Co-Lead Counsel for Plaintiffs

19

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were served January 31, 2001, upon the following counsel via the methods indicated:

| | |
|---|---|
| Patricia J. Villareal<br>Terrence M. Murphy<br>Britt K. Latham<br>JONES, DAY, REAVIS & POGUE<br>2727 North Harwood<br>Dallas, Texas 75201 | ☐ via certified mail, RRR<br>☐ via fax 214/969-5100<br>☐ via first-class, U.S. mail<br>☐ via overnight delivery<br>☑ via hand delivery |
| John D. Donovan<br>Randall W. Bodner<br>Dalila A. Wendlandt<br>ROPES & GRAY<br>One International Place<br>Boston, MA 02110-2624 | ☐ via certified mail, RRR<br>☐ via fax 617/951-7050<br>☐ via first-class, U.S. mail<br>☑ via overnight delivery<br>☐ via hand delivery |
| Sandy A. Liebhard<br>Robert J. Berg<br>BERNSTEIN LIEBHARD & LIFSHITZ<br>274 Madison Avenue<br>New York, NY 10016 | ☐ via certified mail, RRR<br>☐ via fax 713/750-0903<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |
| Thomas E. Bilek<br>HOEFFNER, BILEK & EIDMAN, L.L.P.<br>440 Louisiana, Suite 720<br>Houston, TX 77002 | ☐ via certified mail, RRR<br>☐ via fax 713/227-9494<br>☑ via first-class, U.S. mail<br>☐ via overnight delivery<br>☐ via hand delivery |
| Lee L. Cameron, Jr.<br>WILSON, ELSER, MOSKOWITZ, ELDELMAN &<br>DICKER, LLP<br>5000 Renaissance Tower<br>1201 Elm Street<br>Dallas, TX 75270 | ☐ via certified mail, RRR<br>☐ via fax 214/698-1101<br>☐ via first-class, U.S. mail<br>☐ via overnight delivery<br>☑ via hand delivery |

ROGER L. MANDEL

-20-