ORIGINAL



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
F

OCT 1 7 2001

CLERK, U.S. DIST
By

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLEN ZISHKA and GERALD R. DAILEY, et al., on Behalf of Themselves and All Others Similarly Situated, | § § § | Civ. No. 3-98CV0660- M |
| | § | |
| PLAINTIFFS, | § | CLASS ACTION |
| | § | |
| v. | § | |
| | § | |
| CHARLES G. HANSON, III and RUSSELL M. GARD, | § § § | |
| | § | |
| DEFENDANTS. | § | DEMAND FOR JURY TRIAL |

**PLAINTIFFS' SECOND AMENDED COMPLAINT
FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

## SUMMARY OF ACTION

1.       This is a suit on behalf of purchasers of American Pad & Paper Company ("Ampad"
or the "Company") stock between 6/25/96 and 12/17/97 (the "Class Period"), alleging violations of
§10(b) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 against Ampad's
former senior executives.[1]  This action complains of a scheme by which Ampad attempted to escape
from a failing 1992 leveraged buyout ("LBO") by misrepresenting its business, financial results, and
prospects in order to garner $234 million by way of an initial public offering ("IPO").  Before the
Class Period began, in the IPO Prospectus and throughout the Class Period, defendants made
material misrepresentations and omissions.  Defendants asserted, among other things, that the
Company had policies that insulated its profits from any adverse raw-material price fluctuations.
Defendants also provided investors with financial statements that overstated earnings through
improper methods of reserving the inventory for 4Q96 and 1Q97.

2.       Ampad, a Dallas-based Company, bankrupt since January 10, 2000, marketed
nationally branded and private-label writing pads, file folders, index cards, and envelopes through
its manufacturing divisions to office-products distributors.  In 1992, CEO Hanson and COO Gard
– who ran Ampad as a subsidiary of Mead Corporation – with the help of a venture capitalist (Bain)
purchased the Company in an LBO with short-term financing from Mead.  Hanson and Gard
invested only $280,000 – the majority of the purchase price was borrowed from Mead, leaving
Ampad saddled with a huge acquisition debt.  When Ampad lost over $22 million during 1994-95,
it could barely service, let alone repay, the LBO debt.

3.       By mid-95, defendants knew that the LBO was in danger of failing.  Ampad had
accumulated a *negative* shareholders' equity of $66 million and the book value of Hanson's and
Gard's shares was a *negative* ($17.06) per share.  Hanson and Gard knew that if the collapse of the
Company's floundering LBO was to be avoided, they needed to raise cash to pay down or refinance
the oppressive debt.  Thus, an IPO was the only way to salvage the LBO, pay off investment bankers,

---

[1]This Second Amended Complaint is filed to comply with the Court's September 28, 2001
Order, and without prejudice to plaintiffs' rights to appeal the dismissal of the First Amended
Complaint.

bail them out of a dangerous financial situation, and also create a trading market in the Company's stock.

4.      Completing an IPO for a company that sells pads, cards, form paper, and envelopes presented a tremendous challenge because the office-paper-products industry was viewed, at best, as one of very slow growth and, at worst, a dead investment – plagued by commodity products, rising raw-material prices, intense competition, slow revenue, and an inability to pass rising costs on to customers. In fact, even before the IPO, demand for the products produced by Ampad was softening or declining. Indeed, Ampad lost $7 million in 1994 and $15 million in 1995 due, in part, to decreasing prices it could charge its distributors and small retail customers and decreasing demand. Despite this trend toward obsolescence, defendants needed to make Ampad appear to be a "growth" company in a "growth industry."

5.      In 10/95, in preparation for the IPO and as part of the plan to make Ampad appear profitable, the Company's LBO debt was restructured, Mead was paid off using investment-banker loans, and envelope-manufacturer Williamhouse was acquired. On 6/25/96, Ampad filed its Registration Statement, which included its IPO Prospectus and was signed by Hanson and Gard. The Prospectus emphasized the Company's "new pricing policies," which would guard against the effect of fluctuating raw-material prices.

6.      On 11/10/97, knowing that the Company's false financial accounting and inability to show profitability in the face of rising raw-paper prices would soon be revealed, Hanson and Gard each sold 50,000 shares of Ampad stock – 20% of the stock they actually owned – at $13 per share, pocketing $1.3 million in illegal insider-trading proceeds. Just five weeks later, on 12/17/97, Ampad revealed it would incur a $13.4-million charge and suffer a huge 4thQ-97 loss of $.46-$.50 per share – a loss so large that it would suffer a loss for the full year 1997 as well. Following this revelation, Ampad's stock collapsed to $7-3/4 per share, and continued to decline until the Company ultimately declared bankruptcy and all shareholder value was wiped out. Thus, other than Bain, the only shareholders who profited from investing in Ampad were Hanson and Gard.

7.      The graphs below show Ampad's stock price during the Class Period, and illustrate its collapse as the previously-concealed facts about the Company's business emerged. The

performance of Ampad's stock is also compared to an index of similar companies, which shows that the Company's stock-price action was due largely to Company-specific events and not market forces:





## JURISDICTION AND VENUE

8.      Jurisdiction exists via §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted

arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5,

17 C.F.R. §240.10b-5.  Venue is proper in this District because the Company is based here and many

of the relevant acts occurred here. Defendants used the instrumentalities of interstate commerce and

the facilities of the national securities markets.

## PARTIES

9.      The Court appointed Lead Plaintiffs Gerald R. Dailey, Roger Norton, Priscilla Knight,

David W. Leffler, and Fred E. Ryals, who purchased a total of 7,325 shares of Ampad's stock in July

and September 1997 and were damaged thereby.

10.     (a)      Defendant Charles G. Hanson, III was Chairman of the Board of Directors,

CEO, and a member of Ampad's Executive-Committee.  He owned 250,000 shares of its stock and

sold 50,000 shares for $650,000 in 11/97.

        (b)      Defendant Russell M. Gard was Chief Operating Officer, member of the

Board of Directors, and an Executive-Committee member.  He owned 250,000 shares of its stock

and sold 50,000 shares for $650,000 in 11/97.

11.     Hanson and Gard were Ampad's highest ranking officers, and each had direct

involvement in its everyday business, were privy to confidential information, and were involved in

drafting, reviewing, or disseminating the alleged misleading statements.  As high-level corporate

officers, each of them was responsible for the statements in prospectuses, press releases, and other

documents issued by the Company to the public.

## DEFENDANTS' SCIENTER

12.     Hanson and Gard acquired knowledge of the adverse, material facts alleged because

of their top-level positions with the Company.  They were hands-on managers who interfaced with

each other and other executives, including department and division managers, controlling

shareholder Bain, Board members, as well as Ampad and Williamhouse employees during facility

visits.  Moreover, Hanson and Gard had offices near each other.  Employees observed that it was

their custom and practice to communicate on a regular basis with each other about Company

- 4 -

business and industry trends, especially pricing and costs issues, and they traveled together to Ampad facilities for employee presentations. During the Class Period, Hanson and Gard regularly attended sales and planning, Board, and department meetings. Topics discussed included raw-material price fluctuations and market conditions, product costs, the Company's ability to raise product prices for its customers, profit margins, paper and raw-material inventory levels.

13.     According to a former corporate purchasing group agent, the Company held regular corporate meetings, such as "Shortage Meetings," "Seasonal Promotional Meetings," and "Divisional Meetings," which were attended by Hanson and Gard, and sales, marketing, and financial personnel. In addition, Hanson participated in conference calls with market professionals and analysts and was quoted in Company press releases during the Class Period. He spoke credibly about all aspects of Ampad's business and fiances, as a result of being apprised of all material developments on a regular basis.

14.     The Company also maintained a regular reporting system to ensure that its executives knew about Company-specific business conditions and developments, including sales and pricing-related matters. To that end, the Ampad and Williamhouse divisions regularly generated Performance Reports on how their products were selling; Exceptions Reports on raw-material shortages; Materials Requirements Planning Reports, which were generated once a week by a computerized accounting-inventory system to calculate raw-material amounts to be ordered based on the number of forecasted orders; and Pricing Sheets, for Company products bought and sold. Importantly, Hanson and Gard had access to industry publications, including *Pulp and Paper Weekly*, which reported on commodity prices for raw-materials and pricing-related issues and trends. These publications also confirmed what defendants already knew from internal, but undisclosed data: raw-material costs for paper products, though fluctuating, had been on the rise since at least late-1996.

15.     As a result of these many information sources, Hanson and Gard were regularly informed about Ampad's pricing issues that were critical to the Company's survival. They also knew from direct employee contact and reports during visits throughout the Williamhouse/Niagra and Ampad/Shade/Allied divisions that the cost of goods and raw-material prices were driving the industry and were ***fundamental*** issues crucial to the Company's financial stability and prospects.

16.     Hanson and Gard personally profited from their false and misleading statements about the Company's business.  In 11/97, immediately following Hanson's forecast that Ampad was achieving the promised success and that it would make a profit in 4thQ-97 and in 1997 overall, Hanson and Gard each sold off 20% – 50,000 shares each – of their own Ampad stock for total proceeds of $1.3 million in 11/97, even though they had never before sold any Ampad stock.  Just five weeks later, the Company announced a huge 4thQ-97 loss and its stock collapsed.  Nonetheless, these unusual stock sales generated significant net gains for Hanson and Gard because, unlike Class members who purchased Ampad stock at artificially inflated prices as high as $24 per share, they obtained their stock by way of the LBO for a mere $.22 per share. Since Hanson's and Gard's initial LBO investment was under $300,000, they profited by over $1 million from their involvement in Ampad – even after the stock collapsed.  Moreover, before the IPO in 7/96, the book value of Hanson's and Gard's stock holdings was a negative ($2,298,891).  Thus, the $1.3 million garnered by their 11/97 stock sales was pure profit to Hanson and Gard.

## FALSE ACCOUNTING

17.     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, except that they need not include disclosures that would be duplicative of accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

18.     In an effort to camouflage its declining business condition, Hanson and Gard caused Ampad to issue financial statements that were false and misleading and violated GAAP.  As a result of recording LIFO-reserve reductions in the face of rising raw-material paper prices in late-1996 and early-1997, the Company was able to overstate its earnings and portray itself as more successful than it actually was.  In doing so, Ampad presented materially false financial results during the Class Period in violation of GAAP.

19.     By way of its fraudulent accounting practices, the Company reported the following financial results during the Class Period:

|            | Q4 96      | Q1 97    |
|------------|------------|----------|
| Revenues   | $176.0 M   | $149.8M  |
| Net Income | $ 10.5 M   | $4.0M    |
| EPS        | $0.36      | $0.14    |

* Earnings before extraordinary charges for losses on extinguishment of debt.

20.     Ampad included its FY96 results in a Form 10-K, and its quarterly results for 1stQ FY97 in Forms 10-Q, which were filed with the SEC.  The annual Form 10-K included a report, entitled "Responsibility for the Consolidated Financial Reports," which was signed by Hanson and represented that:

> Company management is responsible for the preparation, accuracy and integrity of the consolidated financial statements and other financial information included in this Annual Report. This responsibility includes preparing the statements in accordance with generally accepted accounting principles and necessarily includes estimates that are based on management's best judgments.

Likewise, the quarterly Form 10-Q represented that the financial statements included all adjustments necessary "for a fair presentation" of the Company's financial results and position.  This statement was also false and misleading because the financial results were neither prepared in accordance with GAAP nor did the financial information "present fairly" the Company's operations.

21.     Ultimately in 12/97, Ampad reported horrible 4thQ-97 results and incurred $13.4 million in pretax charges caused by its accounting improprieties during the Class Period:

> Fourth quarter results will be negatively impacted by the recording of accounting charges aggregating approximately $11.6 million (after-tax), including a $5.9 million (after-tax) charge to increase the Company's LIFO reserve to reflect the anticipated impact of the three paper price increases that were implemented during 1997.  Other charges relate to adjustments to the Company's cost of goods sold and assumed effective tax rate.  In addition, the Company has experienced lower than expected gross margin levels in the fourth quarter, due primarily to a delay in the implementation of price increases by the Company, changes in product mix and an increase in the percentage of promotional sales.

**Ampad's Violation of GAAP in its Inventory Valuation**

22.     GAAP, as set forth in Accounting Research Bulletin No. 43, Chapter 4, Statement 2, states: "A major objective of accounting for inventories is the proper determination of income

through the process of matching appropriate costs against revenues." GAAP also requires that the information presented be reliable. Concepts No. 2, ¶¶58-59, "defines reliability as that quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent."

23.     During the Class Period, Ampad was caught in a profit-margin bind. On one hand, there were fluctuating, but much higher raw-material costs. On the other, the Company was unable to recoup those costs because competitive pressures were causing decreasing prices charged to its customers for finished product.

24.     Ampad utilized the last-in, first-out ("LIFO") method to value its inventory, whereby it assumed that the most recently purchased inventory item – the last in – is the first to be sold – the first out. Accordingly, it was required to expense to cost of goods sold the value of its most recently purchased raw-material inventory, based on the most recent purchase cost. And it should have valued its ending inventory, under LIFO, by the oldest purchase cost for an item in its inventory. *See* AICPA Issues Paper, "Identification and Discussion of Certain Financial Accounting and Reporting Issues Concerning LIFO Inventories," ("LIFO Issues Paper"), 11/30/94.[2]  For example, where a company has 10 units in inventory and the current cost is $6 per unit, the replacement costs of the inventory would be $60. Where four of the units were purchased for $5, and the remaining units were purchased at $6, the LIFO inventory cost would be $56 (4 x 5 = $20 + 6 x $6 = 36). The difference between inventory under LIFO and inventory under replacement costs must be accounted for in a LIFO reserve. In this example, the LIFO reserve would be $4 ($60-$56). Under this method

_____

[2]SEC Accounting Series Release No. 293 states:

> LIFO is an inventory pricing method based on a flow-of-cost assumption that the last item purchased is the first item sold. In times of rising prices, LIFO generally results in higher current costs being charged against income, while older, lower costs are retained in inventory. Of the two fundamental reasons for using LIFO, one is oriented toward financial accounting and the other is income tax oriented. From the standpoint of financial accounting, proponents of LIFO argue that, by charging to expense those costs which more closely reflect the replacement cost of inventory, LIFO tends to reduce the illusionary profits obtained from merely holding inventories and thereby reflects more accurately the "true" income of a company.

1981 SEC LEXIS 1151, at *2 (7/2/81).

of inventory valuation, when Ampad's purchase cost for raw materials increased along with its inventory levels, the replacement cost of inventory also increased. Thus, to properly value its inventory under LIFO, the Company's LIFO reserve should have increased as well. But Ampad's LIFO reserve *decreased* – meaning it went from a negative reserve to zero and then to a positive reserve before it was again reversed in 12/97. This decrease is demonstrated below:



25.    In fact, there was no justification for the decreases in the LIFO reserve in late-1996 and early-1997. Before and during the Class Period, raw-material costs for paper products, though fluctuating, were much higher. Increased raw-material costs were particularly severe in 1997. According to Ampad's 1997 10-K, "[f]rom May 1997 through October 1997, all but one of the key commodity grades of paper utilized by the Company increased in cost between 6% and 18%." In addition, according to the 1996 Form 10-K, gross inventory levels had increased – as of 12/31/95 and 96, they were $103.5 million and $104.8 million, respectively. Thus, Ampad's reduction of its reserve during the Class Period, to a point where it became an addition to inventory instead of a reduction, was unjustified. In fact, by eliminating the LIFO reserve on 12/31/96, and creating a negative reserve for the next four quarters (shown by positive numbers in the chart above), Hanson and Gard added $8.05 million in gross-profit and pretax earnings to Ampad's fourth quarter and

- 9 -

fiscal year ended 12/31/96. This before-tax-earnings increase caused the reported gross margin to be 23.2% for the quarter versus a disastrous 18.7% – an increase of 24%. This accounting impropriety was ultimately corrected in 12/97 when the Company was forced to incur more than $6 million to adjust its LIFO Reserve for 1997 raw-material price increases.

26.     Further, the undisclosed, material, adverse information concealed by Hanson and Gard during the Class Period is the type of information which, because of SEC regulations, national stock-exchange regulations, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to and must be disclosed.

27.     Ultimately, in 4thQ-97, the Company was forced to incur additional operating costs of $13.4 million, including more than $6 million to adjust its LIFO reserve for 1997 price increases. Moreover, since the Class Period, Ampad has admitted that it was saddled with increased costs and had no real way to raise prices for the majority of its customers. As noted in its 1999 Form 10-K: "Since the Company's last acquisition in 1997, revenues have declined, margins have eroded, and inventory levels were, for a period of time, built to an excessive level."

## AMPAD'S INITIAL PUBLIC OFFERING

28.     To generate investor interest in the Ampad IPO and sell the 15-million shares of stock, Hanson and Gard knew that a publicity campaign to distribute favorable information about the Company's business and prospects was necessary. Thus, during the IPO roadshow presentations, Hanson, Benson and Gard stated *inter alia*, that:

•       due to the restructuring of its business, the 10/95 Williamhouse acquisition, and changes in the distribution of office-paper products, Ampad was now a *growth company in a growth industry*.

•       the office-products distribution channel was undergoing a major consolidation into larger superstore outlets. Ampad was organized and uniquely positioned to capitalize on this trend, enabling it to gain market share and achieve strong revenue and EPS growth over the next several years.

•       Ampad had competitive strengths and purchasing advantages, enabling it to secure lower prices for raw materials, which benefitted its profitability.

•       the Company had successfully implemented a pricing strategy to shield its gross-dollar margins from the pricing volatility of raw-materials traditionally present in the paper

business. This would enable it to maintain its profit margins in the face of raw-material-price fluctuations.

These representations increased the demand for and the price of Ampad's stock in the 7/96 IPO.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

29.     On 6/25/96, the Company filed the IPO Registration Statement with the SEC. The Registration Statement was signed by Hanson and Gard and included the IPO Prospectus.

30.     The IPO Prospectus falsely identified "fluctuating paper costs" as a *potential* risk factor that could affect a decision to invest in Ampad. But this was currently plaguing the Company and was not the mere abstract risk presented.   Specifically, the Prospectus claimed that "the Company adopted new pricing policies," which would guard against the affects of fluctuating raw-material prices, and then warned that "no assurance can be given that the Company *will continue* to be successful in maintaining such pricing policies." But when the Prospectus was issued, the "new" pricing policies were already 18 months old and had not and would not protect the Company from the adverse effects of prior fluctuations. In fact, Ampad was still exposed to the same dangers from price fluctuations that negatively affected its earnings in 1994-95.

31.     The IPO Prospectus falsely stated that its previous losses *were not representative of its future results* because it had successfully protected its profitability against fluctuations in raw-material paper prices:

> *Paper Prices. Paper represents a majority of the Company's cost of goods sold*. While paper prices have increased by an average of less than 1% annually since 1989, certain commodity grades have shown considerable price volatility during that period.   This volatility negatively impacted the Company's earnings in 1994, particularly in the fourth quarter, *as a result of the Company's inability to implement price changes in many of its product lines without giving its customers advance notification. Beginning in January 1995, the Company adopted new pricing policies enabling it to set product prices consistent with the Company's cost of paper at the time of shipment. The Company believes that it is now able to price its products so as to minimize the impact of price volatility on dollar margins.*

32.     The positive representations and statements in the Prospectus, and those made during the IPO roadshow by Hanson and Gard were each known to be or were recklessly disregarded by them as being false and misleading when made. The true facts, which they knew, but intentionally or recklessly concealed – disclosure of which was necessary to make the statements not misleading

– were that the Company had not successfully implemented a new pricing strategy that would protect its gross-dollar profit margins from raw-material paper-price fluctuations. Thus, its business remained as exposed as ever to adverse price fluctuations, which Ampad concealed by manipulating and falsifying its financial statements.

33.    On 7/2/96, as a result of strong investor interest generated by Hanson and Gard in roadshow presentations and in the 6/25/96 IPO Registration Statement, which included the IPO Prospectus – signed by Hanson and Gard – Ampad went public selling 12.5 million shares at $15 per share. Bain sold 3.5 million shares for $49 million. Ampad's IPO proceeds – $172.8 million – were used primarily to pay off the huge LBO debt.

34.    On 7/29-30/96, Hanson had conversations with large shareholders, portfolio managers, brokers, stock traders, and analysts, including Christopher Vroom of Alex. Brown, Martin Romm of First Boston, P.M. Iossa of Bankers Trust/BT Securities, and R.F. Runkle of Morgan Stanley Securities, to discuss second-quarter results, representing that Ampad had successfully implemented its new pricing strategy, which would shield its earnings from the volatility of paper prices. In fact, it had achieved outstanding 2ndQ-96 results in the face of raw-material price increases because of this new and successful pricing strategy.

35.    One month after the IPO, on 8/7/96, Alex. Brown issued a report on the Company, written by Christopher Vroom, with a "***strong buy***" recommendation, which was based on and repeated information provided by Hanson and Benson in the 7/29-30/96 conversations, and stated: "Moreover, management has been successful in implementing a pricing strategy to shield earnings from the volatility characteristic of the paper business. Thus, in the just-ended 2Q 1996, despite volatile paper prices, gross profit dollars were well-managed and came in on plan."

36.    On 8/28/96, Morgan Stanley also issued a report, written by R.F. Runkle, which was based on and repeated information provided her by Hanson in the 7/29-30/96 discussions, which stated "***Beginning in 1995, however, the company implemented a pricing policy that enabled it to set prices of its product consistent with the prevailing market price of paper at time of shipment. To date, this policy has been accepted by its customers and has allowed the company to manage its margin dollar in a fluctuating pricing environment***."

37.     On 10/24/96, Ampad reported 3rdQ-96 sales of $173.6 million, net income of $6.9 million, EPS of $.24 (before an extraordinary item), pro forma net income of $8.9 million, and EPS of $.30 and quoted CEO Hanson: "'*We ... continue to meet our profitability goals while increasing market penetration to our fast growing key customers*.'"     Ampad's financial results were later included in the Company's 3rdQ-96 Form 10-Q, which was filed with the SEC and signed by McAleer.

38.     On 10/24/96, Ampad held a conference call for large shareholders, money and portfolio managers, analysts, brokers, and stock traders.   During that call, Hanson made a presentation and answered questions and had follow-up conversations, during which he stated that Ampad was forecasting 1997 EPS of $1.30-$1.40, and a 20% EPS-growth rate after that.

39.     On 11/4 and 11/8/96, First Boston issued reports, written by Romm, which were based on and repeated information provided him in the 10/24/96 conference call and follow-up conversations with Hanson and Gard, in which Romm reported that there had been an increase in uncoated free sheet paper costs that is being implemented by the mills.   *Under AGP's pricing strategy the price increases on paper costs are passed through its customers at the time of shipment*.

40.     On 1/29/97, the Company's stock fell sharply to $22-3/4 from $26-1/2 the day before, when rumors about weakening sales entered the market.

41.     On 2/18/97, Ampad reported its 4thQ-96 results with revenues of $176 million, net income of $10.5 million, and EPS of $.36 (before an extraordinary item), pro forma net income of $11.3 million, and EPS of $.38, and its full year 96 results: revenues of $583 million, net income of $18 million, EPS of $.62 (before an extraordinary charge due to the early extinguishment of debt). The press release quoted CEO Hanson: "'[T]he company *performed exceptionally well during this critical phase*.'"

42.     On 2/18/97, Ampad held a conference call for large shareholders, money and portfolio managers, analysts, brokers, and stock traders. Hanson made a presentation, answered questions, and had follow-up discussions, in which he stated:

- •      4thQ-96 revenue softness was due to short-term one-time issues and revenue growth was already showing up in new orders.

- •      fundamentals were on track and the Company's growth strategy was intact and on track.

- •      Ampad had been able to maintain strong gross-dollar profit margins despite lower retail prices.

- •      Hanson, Gard and other executives were successfully controlling costs, and thus continued to expect EPS growth to exceed revenue growth.

- •      there was no change in the fundamental growth characteristics and they still expected 12%-14% internally generated revenue growth, 25% on average EPS growth over the next three-five years, and at least 20% EPS growth sequentially during 1997.

- •      due to short-term factors – and not any significant problems with its business – the Company was now forecasting slightly lower EPS growth: 1997 EPS of $1.25-$1.35, 1998 EPS of $1.60-$1.70, and 20% annual EPS growth going forward.

43.      On 2/20/97, Alex Brown issued a report written by Vroom, which was based on and repeated information provided in the conference call and follow-up conversations with Hanson, which reported that "Strong gross margin gains neutralized the revenue volatility .... AP&P's pricing policy enables it to manage gross profits regardless of high or low paper price levels.  We consider this to be a significant mitigant to the top-line volatility expected of a producer of paper product, ...."

44.      In late 3/97, the Company issued its 1996 Annual Report to Shareholders, which reported 1996 revenues of $583 million, net income of $18 million, and EPS of $.62 (before an extraordinary item relating to early extinguishment of debt).

45.      In late-March 1997, the Company filed its Report on Form 10-K with the SEC, which included its 1996 financial results and was signed by CEO Hanson and COO Gard, and stated:

> ***Paper Prices***.  Paper represents a majority of the Company's cost of goods sold....  Beginning in January 1995, the Company adopted new pricing policies enabling it to set product prices consistent with the Company's cost of paper at the time of shipment.  The Company believes ***that it is now able to price its products so as to minimize the impact of price volatility on dollar margins***.

46.      On 4/1/97, Ampad disclosed that its 1stQ-97 revenues would be about $149 million – ***slightly*** below earlier forecasts and blamed the shortfall on the "current consolidation activities in the office superstore market" and a "slight softening of paper prices."  This disappointing announcement caused its stock to plunge from $16 on 3/31/97, to as low as $11-1/8 the next day.  This stock-price decline was a matter of great concern to defendants – it came just nine months after

- 14 -

the IPO. Thus, they mounted a strong effort to reinflate the stock price by minimizing the nature of the 1stQ-97 shortfall and represented that Ampad's core business was strong, its growth prospects largely intact, and that it would show strong EPS growth in the second half of 1997. For instance, the 4/1/97 release stated that Ampad considered its 1stQ-97 results a "'*respectable operating performance*,'" it was "'*pleased with our ability to maintain operating margins in this environment*,'" and reassured investors that "'*the fundamental core business is sound*.'"

47.    On 4/1 and 4/2/97, Hanson had conversations with analysts to reassure them that the 1stQ-97 shortfall was minimal, Ampad's core business strategy was working, and it was positioned to achieve strong 1997-98 EPS growth. During those conversations the CEO stated:

•    1stQ-97 softness was due to short-term, one-time "mechanical" issues, which would be overcome in second-half 1997, and products sell-through at retail remained strong.

•    fundamentals were intact and business-growth strategy was on track.

•    Ampad was able to maintain strong gross-profit margins, despite lower retail prices and paper-price hikes.

•    there was no change in the fundamental growth characteristics – Ampad still expected 12%-14% internally generated revenue growth, with at least 20% EPS growth sequentially during 1997.

•    due to short-term factors – and not any significant problems – the Company was still forecasting 1997 EPS of $1.15-$1.35 (and very strong 3rdQ and 4thQ EPS), and 1998 EPS of $1.40-$1.70, with 15%-25% annual EPS growth going forward.

48.    On 4/2/97, Alex. Brown issued a report, written by Vroom, based on discussions with Hanson, which stated:

Another factor contributing to the lower-than-planned revenues is the March 1997 decline in uncoated free sheet prices initiated by the mills. We believe sales to paper merchants could be temporarily constrained by those customers delaying purchases in anticipation of further price declines. *We note that price declines would impact top-line growth but would not necessarily be negative to profitability since AP&P's arrangements with customers allows it to manage gross profit dollars.*

49.    As a result of these positive reassurances and forecasts of continued growth, the Company's stock rallied to close at $13-7/8 on 4/1/97, and started to move higher, reaching $19-7/8 on 5/7/97, recovering some of the ground that it had lost over the prior several months.

- 15 -

50.     On 4/21/97, Ampad reported its actual 1stQ-97 results: revenues of $149.8 million, net income of $4.7 million, and EPS of $.16 (excluding a consulting fee associated with the Niagara acquisition).

51.     On 5/15/97, the Company filed its 1stQ-97 Report on Form 10-Q with the SEC, which reported the earlier released financial results, and reiterated the IPO Prospectus Statement about paper prices and the 1995 pricing policies.

52.     On 7/16/97, the Company held a conference call for large shareholders, money and portfolio managers, analysts, brokers and stock traders.   During that call Hanson made a presentation, answered questions, had follow-up conversations, and stated:

- industry conditions, which had contributed to Ampad's soft 4thQ-96 and 1stQ-97 revenues, were due to short-term, one-time "mechanical" issues that had been overcome. The Company expected very strong growth in second-half 1997 and sell-through and retail remained strong.

- there was no change in its fundamental growth characteristics – Ampad still expected 15%-25% EPS growth over the next three-to-five years and at least 20% EPS growth sequentially during 1997.

- due to short-term factors – and not any significant problems – the Company was still forecasting 1997 EPS of $1.21-$1.30 (and very strong 3rdQ and 4thQ-97 EPS), 1998 EPS of $1.50-$1.70, with 15%-25% annual EPS growth going forward.

53.     On 7/7/97, Alex Brown issued a report, written by Vroom, entitled "F2Q RESULTS CONFIRM EFFECTIVE STRATEGY," based on and repeated statements from the 7/16/97 conference call and follow-up conversations with Hanson, which stated that "***The Company has successfully passed on paper price increases to its customers since implementing its pricing policy in January 1995, thereby mitigating the gross profit risk normally associated with such commodity fluctuations.***"

54.     On 7/17/97, First Boston issued a report, written by Vromm, based on and repeating statements from the 7/16/97 conference call and follow-up conversations with Hanson, which stated:

"***Tighter supply of uncoated free sheet paper is expected to raise prices again in August, it has been American Pad & Paper strategy to pass along the higher cost of paper at the time of invoice***.  The net effect is that margins tend to lag in a rising paper market although the dollar profit margin remains the same."

- 16 -

55.     On 8/15/97, Ampad filed its 2ndQ-97 Report on Form 10-Q with the SEC, which repeated the earlier reported results and repeated the paper-pricing policy statement issued in its IPO Prospectus.

56.     As a result of the Company's purported very strong, above-expectation 2ndQ-97 results and Hanson's very favorable statements, assurances and forecasts, Ampad's stock price climbed back to $24-15/16 on 8/22/97 – close to its all-time high of $26-1/2.

57.     On 9/15/97, Ampad suddenly revealed that instead of the strong 3rdQ and 4thQ-97 revenue and EPS growth Hanson had been forecasting, the Company would at best achieve flat revenues and would suffer a sharp decline in EPS during those quarters. Consequently, its stock price dropped sharply – from $24-3/8 per share on 9/15/97, to $11-1/2 per share over the next five trading sessions as investors reacted to these startling revelations. Nevertheless, in private discussions with analysts, Hanson continued to forecast 1997 EPS of $.48-$.52. Moreover, even with the disappointing 3rdQ and 4thQ-97 results, he said that *the Company would be profitable in both quarters* and achieve 1997 EPS of $.48-$.52 per share, while representing that its long-term growth prospects remained intact. These statements were false. The Company would eventually suffer losses in those periods as well. But because of Hanson's shortfall in candor, the stock continued to trade at inflated prices throughout the balance of the Class Period.

58.     On 10/22/97, the Company reported its actual 3rdQ-97 results: revenues of $176.5 million, net income of $1.6 million, EPS of $.06 and held a conference call for large shareholders, money and portfolio managers, analysts, brokers and stock traders. During that call Hanson made a presentation, answered questions, and had follow-up conversations, during which he stated that:

•       the Company still expected 12%-14% internally generated revenue growth and EPS growth over the next three-to-five years.

•       it expected to report 4thQ-97 EPS of $.10-$.12, a profit for all of 1997 of $.48-$.52, and it was still forecasting EPS growth in 1998 to $.70-$.80, with 15%-25% annual EPS growth going forward.

59.     On 11/3/97, the Company announced that CFO McAleer had resigned "to pursue other interests." One week later, knowing that Ampad had been falsifying its reported financial results for several quarters and that this would shortly be exposed, Hanson and Gard each sold off

50,000 shares – 20% of the stock they actually owned at $13 per share – allowing them each to pocket $650,000 in illegal insider-trading proceeds. These sales took place just after Hanson forecasted that the Company would achieve 4thQ-97 profits and 1997 EPS of $.48-$.52, and when Hanson and Gard knew that financial results in 1997 had been phony and that Ampad would suffer a huge loss in the 4thQ and a loss for 1997 as a whole.

60.    On or about 11/14/97, the Company filed its Report on Form 10-Q for the third-quarter ended 9/30/97, signed by Controller William W. Solomon, which reported the same 3rdQ-97 financial results announced earlier and reiterated its paper-pricing policy stated in the 1stQ and 2ndQ reports.

61.    The representations and statements made by Hanson between 7/2/96 and 11/4/97, were known to be or were recklessly disregarded by him as being false and misleading when made. The true facts, which he knew, but were intentionally or severely recklessly concealed – disclosure of which was necessary to make the statements not misleading – were that proprietary products of Williamhouse that utilized refined grades of paper stock were fairly consistent in price, but commodity-grade products – its largest category – based on pulp-grade paper were affected by fluctuations in raw-material costs. Customers knew about the raw-material cost increases as soon as Williamhouse did, but they played Williamhouse and its competitors against each other. As explained by national account executives, contrary to its 1995 price-protection policy, Ampad was forced to play "who's-going-to-blink first" with competing firms to raise prices, which it desperately needed to do. But Ampad could not raise prices for its major customers and had not successfully implemented a new pricing strategy that would protect its gross dollar profit margins from raw material paper price fluctuations.

62.    On 12/17/97, the Company revealed it would suffer *a 4thQ-97 loss of $.46-$.50 per share – so large that it would suffer a loss for the full year 1997*. The loss was due, in part, to millions in accounting charges to increase Ampad's LIFO reserve to reflect the affect of paper-price increases during late-1996 and early-1997. The Company revealed it had *not been able to increase prices* and, in fact, had been *discounting* prices to sell products. The stock price declined sharply

on these revelations – from $12 per share on 12/16/97, to $7-3/4 on 12/18/97 – and it never recovered.

63.     On 1/10/00, involuntary Chapter 11 bankruptcy was commenced against Ampad, its subsidiaries and affiliates.  On 1/14/00, the debtor converted the proceeding to a voluntary Chapter 11.

**FIRST CLAIM FOR RELIEF**
**For Violation of Section 10(b) of the**
**1934 Act and Rule 10b-5**

64.     Plaintiffs incorporate by reference ¶¶1-64.

65.     Hanson and Gard knew or had access to the material, adverse, non-public information about Ampad's financial results and then existing business conditions, which was not disclosed, and participated in drafting, reviewing or approving the misleading statements, releases, reports and other public representations of and about the Company.

66.     During the Class Period, these defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements alleged, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

67.     These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and the Class in connection with their purchases of Ampad's stock during the Class Period.

68.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ampad's stock.  Lead Plaintiffs and the Class would not have purchased the Company's stock at the prices they paid, or at all, if they had

- 19 -

been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## SECOND CLAIM FOR RELIEF
### For Violation of Section 20(a) of the 1934 Act

69.    Plaintiffs incorporate ¶¶1-69 by reference.

70.    Hanson, the Company's Chairman and CEO and Gard, its Chief Operating Officer, acted as controlling persons of Ampad within the meaning of §20(a) of the 1934 Act.  By reasons of their positions, including membership on the Company's Executive Committee, each had the power and authority to cause Ampad to engage in the wrongful conduct alleged.

## CLASS-ACTION ALLEGATIONS

71.    Lead Plaintiffs bring this action as a class action under Federal Rules 23(a) and (b)(3) on behalf of all persons who purchased Ampad's stock during the Class Period (6/25/96-12/17/96). Excluded are defendants, members of their immediate families, and any entity in which a defendant has a controlling interest.

72.    Class members are so numerous that joinder of all is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Ampad had more than 27 million shares of stock outstanding, owned by hundreds of shareholders nationwide.  During the Class Period the Company's stock traded in an efficient market on the New York Stock Exchange under the symbol "AGP."

73.    There is a well-defined commonality of interest in the questions of law and fact involved in this case that predominate over questions that may affect individual Class members, including:

      (a)    whether the federal securities laws were violated by defendants;

      (b)    whether defendants omitted or misrepresented material facts;

      (c)    whether defendants' statements omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

      (d)    whether defendants acted with scienter;

(e)    whether the price of Ampad's stock was artificially inflated during the Class Period; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

74.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

75.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class-action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

76.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

77.    The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action under Rule 23(a);

B.    Awarding Lead Plaintiffs and the Class members damages and post-judgment interest;

C.    Awarding extraordinary, equitable, or injunctive relief as permitted by law, equity, and federal statutory provisions invoked under Rules 64 and 65, and any appropriate state-law remedies; and

D.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: October 17, 2001

STANLEY, MANDEL & IOLA, L.L.P.
MARC R. STANLEY
Texas State Bar No. 19046500
ROGER L. MANDEL
Texas State Bar No. 12891750
MARTIN WOODWARD
Texas State Bar No. 00797693

*Marc R. Stanley* / with permission
                    Martin Woodward

MARC R. STANLEY

3100 Monticello Avenue, Suite 750
Dallas, TX 75205
214/443-4300
214/443-0358 (fax)

**Liaison Counsel for Plaintiffs**

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
California Bar No. 68581
G. PAUL HOWES
California Bar No. 187772
RANDALL J. BARON
California Bar No. 150796
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
California Bar No. 121590
MATTHEW P. MONTGOMERY
California Bar No. 180196
402 West Broadway, Suite 850
San Diego, CA 92101
Telephone: 619/230-0800

**Co-Lead Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were served October 17, 2001, upon the following counsel via the methods indicated:

| | |
|---|---|
| Patricia J. Villareal<br>Terrence M. Murphy<br>Britt K. Latham<br>JONES, DAY, REAVIS & POGUE<br>2727 North Harwood<br>Dallas, Texas 75201 | □ via certified mail, RRR<br>□ via fax 214/969-5100<br>□ via first-class, U.S. mail<br>□ via overnight delivery<br>☒ via hand delivery |
| Mr. Robert H. Klonoff<br>JONES DAY REAVIS & POGUE<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001-2113 | □ via certified mail, RRR<br>□ via fax 202/626-1700<br>☒ via first-class, U.S. mail<br>□ via overnight delivery<br>□ via hand delivery |
| Sandy A. Liebhard<br>Robert J. Berg<br>BERNSTEIN LIEBHARD & LIFSHITZ<br>274 Madison Avenue<br>New York, NY 10016 | □ via certified mail, RRR<br>□ via fax 713/750-0903<br>☒ via first-class, U.S. mail<br>□ via overnight delivery<br>□ via hand delivery |
| Thomas E. Bilek<br>HOEFFNER, BILEK & EIDMAN, L.L.P.<br>440 Louisiana, Suite 720<br>Houston, TX 77002 | □ via certified mail, RRR<br>□ via fax 713/227-9494<br>☒ via first-class, U.S. mail<br>□ via overnight delivery<br>□ via hand delivery |

_Marc R. Stanley_

MARC R. STANLEY